Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 11, 2003      Decided March 14, 2003

No. 01-1471

CASINO READY MIX, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

————

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

————

*James T. Winkler* argued the cause and filed the briefs for petitioner.

*Eric D. Duryea*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith L. Jason*,

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Supervisory Attorney. *Deirdre C. Fitzpatrick*, Attorney, entered an appearance.

Before: EDWARDS and ROGERS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Petitioner Casino Ready Mix, Inc. ("Casino") seeks review of the Decision and Order of the National Labor Relations Board ("NLRB" or "Board") in *Casino Ready Mix, Inc.*, 335 N.L.R.B. No. 39, 2001 WL 1039902 (Aug. 27, 2001). The Board found that Casino committed unfair labor practices ("ULPs") in violation of §§ 8(a)(3) and (1) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(3) and (1), in discriminatorily refusing to assign work to complainant Charles Phillips and in discriminatorily refusing to hire complainants Bill Dooley and Wayne King, because the complainants were union organizers for Teamsters, Chauffeurs, Warehousemen and Helpers, Local 631 (the "Union"). The Board also found that Casino committed an ULP when Gary Bale, petitioner's owner and president, told an employee that the company would never allow the Union to represent its employees and that he would either move Casino's operation or replace the company's truckdrivers with owner-operators before dealing with the Union. The Board held that Bale's statement violated § 8(a)(1), and also demonstrated petitioner's animus against the Union, a factor relevant to the complaint's § 8(a)(3) allegations.

In its petition for review, Casino argues that the Board erred in excluding evidence offered to support petitioner's affirmative defense that Phillips, Dooley, and King were properly denied work because of their "disabling conflicts" as Union organizers; that the Board erred in finding an ULP and adverse inference in connection with Bale's antiunion statement, because the General Counsel's complaint before the Board never expressly alleged that Bale's statement was an unfair labor practice; and that the Board erred in finding that the Administrative Law Judge ("ALJ") had conducted a

complete and fair review of the entire record. We find no merit in these claims.

There is substantial evidence in the record to support the Board's finding that Casino was determined not to assign Phillips any work and decided not to hire King and Dooley because these men were union organizers. The Board also properly rejected Casino's "disabling conflict" defense. Under established law, "salting" may be found to be a disabling conflict when a union organizer seeks work while engaged in an economic strike against the employer; or when the employer demonstrates that the purported organizational activity is a subterfuge used to further purposes unrelated to organizing, undertaken in bad faith, designed to result in sabotage, or designed to drive the employer out of the area or out of business. The Board found that the evidence proffered by Casino did not purport to demonstrate any of these affirmative defenses. The Board also properly rejected Casino's objections to the § 8(a)(1) ULP charge implicating Bale. The Board found that, although the General Counsel's complaint did not specifically allege that Bale's statement violated the Act, Casino had clear notice of the charge, and, in addition, petitioner did not object to the testimony implicating Bale and did not pursue an opportunity for cross-examination to contest it. Finally, there is no credible evidence supporting Casino's claim that the Board denied it a complete and fair review of the entire record. Accordingly, we deny the petition for review, and grant the NLRB's cross-application for enforcement.

## I.  BACKGROUND

Casino prepares, sells, and distributes ready-mix concrete and related products in Las Vegas, Nevada. On September 29, 1997, the Regional Director for Region 28 of the NLRB issued a Complaint and Notice of Hearing alleging that petitioner had violated §§ 8(a)(3) and (1) of the Act. *See* 29 U.S.C. §§ 158(a)(3) and (1) (providing that it is an unfair labor practice for an employer to "encourage or discourage membership in any labor organization" through "discrimina-

tion in regard to hire or tenure of employment or any term or condition of employment," or "to interfere with, restrain, or coerce employees in the exercise of" their rights to self-organization and collective bargaining). On September 18, 1998, an ALJ issued a decision finding that petitioner had violated both provisions. On August 27, 2001, the Board issued a Decision and Order holding that petitioner had violated §§ 8(a)(3) and (1) of the Act; the Board's findings and conclusions, however, differed somewhat from those of the ALJ.

The Board found, without dissent, that petitioner had discriminatorily refused to hire both Dooley and King, and had discriminatorily refused to assign work to Phillips. Dooley, King, and Phillips all were union organizers. The Board's principal findings were that,

> [w]hen Phillips applied for a driver position at [Casino's] office on March 28, he did not reveal that he was a union organizer. He was hired on April 8. Soon thereafter, [Casino] found out that he was an organizer, and [petitioner] admitted at the hearing that it did not assign work to him specifically because of that fact. Phillips did not receive work assignments until on or about August 15, after unfair labor practice charges had been filed. . . .

> Alleged discriminatees Dooley and King applied for driver positions on April 8, when [Casino] was advertising to hire drivers. Both wore shirts identifying themselves as organizers for the Union as well as baseball caps with union logos. Each stated his organizer status on his application; Dooley added on his that he intended to organize [petitioner's] employees. Although [Casino] accepted their applications, they were told that the Company was not hiring at that time, and in fact they were not hired. [Casino] hired four other drivers between April 8 and 21.

> [Casino's] newspaper advertisements required that truckdriver applicants "must have CDL (a

chauffeur's license) with clean record. Must know pneumatics." Dooley had 9 years experience in the ready-mix concrete industry and a CDL with all required endorsements. [Petitioner] admitted that Dooley was qualified for the driver position being advertised. King's qualifications were comparable to Dooley's: 6 years experience in the ready-mix industry and a CDL with all required endorsements. [Casino] does not dispute, and we find, that King was qualified for the advertised position as well.

*Casino Ready Mix*, 2001 WL 1039902, at \*4. Based on these findings (including Casino's admission that Phillips did not receive work assignments because he was a Union adherent), the Board concluded that petitioner's refusal to assign work to Phillips was unlawfully discriminatory in violation of §§ 8(a)(3) and (1) of the Act.

While the ALJ's decision was pending before the Board on exceptions, the Board issued *FES (a Division of Thermo Power)*, 331 N.L.R.B. 9 (2000). In that decision, the Board clarified the legal elements of a discriminatory refusal-to-hire violation. On June 13, 2000, the Board invited the parties in this case to file briefs addressing the applicability of the *FES* analytical framework to the refusal-to-hire issues raised by the complaint in this case. *Casino Ready Mix*, 2001 WL 1039902, at \*3.

In *FES*, the Board defined the elements of a refusal-to-hire violation, as follows:

To establish a discriminatory refusal to hire, the General Counsel must, under the allocation of burdens set forth in Wright Line, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), first show the following at the hearing on the merits: (1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the

> employer has not adhered uniformly to such require-
> ments, or that the requirements were themselves
> pretextual or were applied as a pretext for discrimi-
> nation; and (3) that antiunion animus contributed to
> the decision not to hire the applicants. Once this is
> established, the burden will shift to the respondent
> to show that it would not have hired the applicants
> even in the absence of their union activity or affilia-
> tion.

*FES*, 331 N.L.R.B. at 12 (footnote references omitted). Ap-
plying the principles of *FES* to the record in this case, the
Board concluded that the General Counsel had established
the factors constituting a discriminatory refusal to hire viola-
tion with respect to Dooley and King. Because the Board
held that the *FES* factors had been established, the burden
shifted to petitioner to demonstrate that it would not have
hired either Dooley or King regardless of their status as
union organizers.

In attempting to prove that Dooley and King would not
otherwise have been hired, petitioner argued that it had
never received King's application. The Board rejected this
contention. Like the ALJ, the Board credited the testimony
of Dooley and King that they had filled out their applications
at petitioner's office and submitted them personally to peti-
tioner's general manager, Doug Anderson. Thus, the NLRB
held that petitioner's refusal to hire King violated §§ 8(a)(3)
and (1) of the Act. *Casino Ready Mix*, 2001 WL 1039902, at
*4.

As to Dooley, petitioner had asserted that he was not hired
because he lacked recent driver experience, his applications
contained inaccuracies, and his then-current job with the
Union paid more than he would earn as a driver for petition-
er. However, at the hearing before the ALJ, General Manag-
er Anderson testified that the first two proffered points were
not actually the reason that petitioner had not hired Dooley.
Anderson initially stated that the salary issue was the true
reason, but he later testified "that Dooley's arrogance at the
time he submitted his application was also a significant reason

for denying him employment." *Id.* at \*5. Both the ALJ and the Board found that Anderson's testimony was not credible because he put forward "shifting, pretextual rationales for not hiring Dooley." *Id.* The NLRB thus held that petitioner's refusal to hire Dooley also violated §§ 8(a)(3) and (1) of the Act.

A majority of the Board (with then-Chairman Hurtgen dissenting) also found that petitioner had violated the Act through an antiunion threat made by its owner and president, Gary Bale. In finding that Bale had made an antiunion threat, the Board credited the testimony of Scott Newcomb, a Casino employee. Newcomb testified that, in the late summer or early fall of 1997, Bale had stated that petitioner "would never allow the Union to represent its employees, that instead he would either move the Respondent's Las Vegas operation or replace the truckdrivers with owner-operators." *Id.* at \*2. The Board found that this statement constituted a threat in violation of § 8(a)(1) of the Act. *Id.* at \*2-\*3.

Casino now petitions for review of the NLRB's order, and the Board cross-applies for enforcement.

## II.  ANALYSIS

### A.  Disabling Conflict Defense

The most important issue in this case concerns the Board's rejection of petitioner's "disabling conflict" defense. As noted above, the Board found that the General Counsel had established, consistent with the three elements set forth in *FES*, that Casino discriminatorily refused to hire Dooley and King, and that petitioner had not met its burden of demonstrating that it would not have hired either of them regardless of their protected status. *Casino Ready Mix*, 2001 WL 1039902, at \*3-\*5. The Board also found that Phillips had been denied work because he was a Union organizer. Casino admitted at the hearing before the ALJ that, once the company found out that Phillips was a Union organizer, company officials did not assign work to him "specifically because of that fact." *Id.* at \*4. The Board thus found, "based primarily on [Casino's]

admission, that the refusal to assign work to Phillips was discriminatory and violated Section 8(a)(3) and (1)." *Id.* The Board also held that Casino's "discrimination against Phillips because of his union status lends support to a finding of antiunion animus with respect to the complaint allegations involving Dooley and King." *Id.* The Board's findings are fully supported by substantial evidence in the record and, therefore, command our deference. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Petitioner nonetheless claims that the unfair labor practice findings should be overturned, because Phillips, Dooley, and King, as paid union organizers, had "disabling conflicts." This claim is meritless.

In *Sunland Construction Co.*, 309 N.L.R.B. 1224, 1228 (1992), the Board held that, "[u]pon reexamination of our analysis of the scope of Section 2(3) in *Oak Apparel* [218 N.LR.B. 701 (1975)] and its progeny, we conclude that the definition of 'employee' encompasses paid union organizers." The Board went on to hold that:

> While working for the employer, the paid organizer is subject to its direction and control, and is responsible for performing assigned work. The organizer's activities, like those of any employee, may be limited pursuant to lawful no-solicitation rules. *Republic Aviation Corp. v. NLRB*, [324 U.S. 793, 802-03 n.10 (1945)]. Outside work time, however, the organizer—like other workers—is free to solicit for the union. Id. The fact that a paid organizer may approach his nonwork time organizing activities with greater vigor than an unpaid union adherent is not an acceptable basis for denying the organizer statutory protections . . . .

> If the organizer violates valid work rules, or fails to perform adequately, the organizer lawfully may be subjected to the same nondiscriminatory discipline as any other employee. See *Wellington Mills Div. v. NLRB*, 330 F.2d 579 (4th Cir. 1964), cert. denied 379 U.S. 882; *Sears, Roebuck & Co.*, 170

NLRB 533 (1968). In the absence of objective evidence, however, we will not infer a disabling conflict or presume that, if hired, paid union organizers will engage in activities inimical to the employer's operations. Thus, we find no policy reason to disregard present decisional law to find that since a union organizer serves the union as well as the company he is eliminated from the definition of employee under Section 2(3) of the Act.

*Id.* at 1229-30.

The Board's judgment in *Sunland Construction* accords with the opinion issued by the Supreme Court three years later in *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85 (1995). In *Town & Country*, the Court held that a worker may be an "employee," within the terms of the NLRA, even if, at the same time, a union pays that worker to help the union organize the company. The Court's discussion of this point is illuminating:

> [The employer] argues that, when the paid union organizer serves the union—at least at certain times in certain ways—he organizer is acting adversely to the company. Indeed, it says, the organizer may stand ready to desert the company upon request by the union, in which case, the union, not the company, would have "the right . . . to control the conduct of the servant." Thus, it concludes, the worker must be the servant (*i.e.*, the "employee") of the union alone. See [RESTATEMENT (SECOND) OF AGENCY] § 1, and Comment *a*, p. 8 ("agent" is one who agrees to act "subject to [a principal's] control").
>
> As Town & Country correctly notes, in the context of reviewing lower courts' interpretations of statutory terms, we have said on several occasions that when Congress uses the term "employee" in a statute that does not define the term, courts interpreting the statute " 'must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of th[at] ter[m]. . . . In the

past, when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.' " ... At the same time, when reviewing the *Board's* interpretation of the term "employee" as it is used in the Act, we have repeatedly said that "[s]ince the task of defining the term 'employee' is one that 'has been assigned primarily to the agency created by Congress to administer the Act,' ... the Board's construction of that term is entitled to consideration deference...." In some cases, there may be a question about whether the Board's departure from the common law of agency with respect to particular questions and in a particular statutory context, renders its interpretation unreasonable.... But no such question is presented here since the Board's interpretation of the term "employee" is consistent with the common law.

Town & Country's common-law argument fails, quite simply, because, in our view, the Board correctly found that it lacks sufficient support in common law. The Restatement's hornbook rule (to which the quoted commentary is appended) says that a

> "person *may* be the servant of two masters ... *at one time as to one act,* if the service to one does not involve *abandonment* of the service to the other." Restatement (Second) of Agency § 226, at 498 (emphasis added).

The Board, in quoting this rule, concluded that service to the union for pay does not "involve abandonment of ... service" to the company. 309 N.L.R.B., at 1254.

And, that conclusion seems correct. Common sense suggests that as a worker goes about his or her *ordinary* tasks during a working day, say, wiring sockets or laying cable, he or she *is* subject to the control of the company employer, whether or not

the union also pays the worker. The company, the worker, the union, all would expect that to be so. And, that being so, that union and company interests or control might *sometimes* differ should make no difference. As Prof. Seavey pointed out many years ago, "[o]ne can be a servant of one person for some acts and the servant of another person for other acts, even when done at the same time," for example, where "a city detective, in search of clues, finds employment as a waiter and, while serving the meals, searches the customer's pockets." W. Seavey, Handbook of the Law of Agency § 85, p. 146 (1964). The detective is the servant both "of the restaurateur" (as to the table waiting) and "of the city" (as to the pocket searching). *Ibid.* How does it differ from Prof. Seavey's example for the company to pay the worker for electrical work, and the union to pay him for organizing? Moreover, union organizers may limit their organizing to nonwork hours . . . . If so, union organizing, when done for pay but during *nonwork* hours, would seem equivalent to simple moonlighting, a practice wholly consistent with a company's control over its workers as to their assigned duties.

*Id.* at 93-95. Although *Sunland Construction* was decided before *Town & Country,* it is perfectly consistent with the Court's views. And the Board has followed this line of analysis in its subsequent decisions. *See, e.g.*, *Braun Elec. Co.*, 324 N.L.R.B. 1 (1997); *M.J. Mech. Servs.*, 324 N.L.R.B. 812 (1997).

Under *Braun Electric*, *M.J. Mechanical Services*, and *Sunland Construction*, it is clear that individuals seeking jobs from an employer pursuant to a union's "salting" program are statutory employees entitled to protections under the Act. *Braun Elec.*, 324 N.L.R.B. at 3; *M.J. Mech. Servs.*, 324 N.L.R.B. at 816. The fact that individuals are being subsidized by a union or are on the job to organize does not deprive them of the Act's protections. *Braun Elec.*, 324 N.L.R.B. at 3; *Sunland Constr. Co.*, 309 N.L.R.B. at 1225-26.

Moreover, even when a salting campaign is intended in part to provoke an employer to commit unfair labor practices, union organizers retain their status as employees. *M.J. Mech. Servs.*, 324 N.L.R.B. at 813-14; *see also Godsell Contracting*, 320 N.L.R.B. 871, 874 (1996).

"This is not to say that the law treats paid union organizers like other company employees in every labor law context." *Town & Country*, 516 U.S. at 97. Thus, for example, in *Sunland Construction* the Board held that an "employer should not be required during a strike to hire a paid organizer whose role is inherently and unmistakably inconsistent with employment behind a picket line." *Sunland Constr. Co.*, 309 N.L.R.B. at 1230 (internal quotations omitted). The Board reasoned that

> an employer faced with a strike can take steps aimed at protecting itself from economic injury. For example, an employer can permanently replace the strikers, it can lock out the unit employees and it can hire temporary replacement for the locked-out employees. Consistent with these principles, we believe that the employer can refuse to hire, during the dispute, an agent of the striking union.

*Id.* at 1231. Moreover, in *M.J. Mechanical Services* and *Braun Electric*, the Board indicated that "salting" also may be found to be unprotected if the purported organizational activity is a subterfuge used to further purposes unrelated to organizing, undertaken in bad faith, designed to result in sabotage, or designed to drive the employer out of the area or out of business. *Braun Elec.*, 324 N.L.R.B. at 3 n.3; *M.J. Mech. Servs.*, 324 N.L.R.B. at 813-14.

In the instant case, petitioner claims that the ALJ improperly denied it an opportunity to offer evidence to demonstrate that the Union salts sought to engage in unprotected activity and, thus, were properly denied work because of their disabling conflicts. The Board found no merit in this claim. Given the somewhat imprecise boundaries of activities that constitute unprotected disabling conduct, an ALJ normally would be expected to allow evidence in permitting an employer to

make an argument on disabling conflict based on slightly different facts than have been previously recognized as making out the legal defense. Still, we have little difficulty in agreeing with the Board that petitioner's proffer here does not raise a serious issue.

The Board noted that

> [Casino] sought to establish that (1) Phillips filed applications with several employers at the same time in April 1997 and that in October 1997, while employed by the [petitioner], he engaged in a short economic strike and a subsequent unfair labor practice strike; (2) that after being denied employment, Dooley attempted to convince an employee of the Respondent to go to work for a union contractor; and (3) that 30 applicants appeared outside the Respondent's office when King and Dooley applied for work.

*Casino Ready Mix*, 2001 WL 1039902 at \*4 n.7. The Board, citing *Town & Country, M.J. Mechanical Services,* and *Braun Electric*, held that Casino's proffer was properly rejected by the ALJ, because the evidence offered would not have demonstrated disabling conflicts. *Id.* The Board plainly did not err in this conclusion. The Board's judgment rests on the agency's reasonable interpretation of "employee." And as the Court in *Town & Country* noted, "the Board's construction of ['employee'] is entitled to considerable deference." 516 U.S. at 94 (internal quotations omitted).

Before this court, Casino argues that the Board should be reversed, because its holding in this case impermissibly extends established precedent. To support this claim, petitioner notes that, at the hearing before the ALJ, the Board's General Counsel argued that the employer's offer of evidence should be rejected, in part, because a union's "campaigning or organizational tactics as they relate to other employers" are "completely irrelevant." Counsel for the Acting General Counsel's Motion in Limine at 2, App. 22. The ALJ, appearing to agree with the General Counsel, rejected petitioner's evidentiary proffer, because, in his view,

the current state of the law is merely that a "salter" will lose his "protected" status during the time that he is engaged in "bad faith" activity. Nothing more. I see no warrant for me to go further and find that a "salter" who may have engaged in "bad faith" activity in some other situation at some other place with some other employer in the past has lost his protected status for all time, much less in the specific case I am hearing.

Order Denying Motion in Limine at 5, App. 55.

The ALJ's holding does not correspond with prevailing law, so it is unsurprising that the Board did not endorse either the General Counsel's or the ALJ's view of the law regarding the standards governing "salting" activity and the evidence necessary for an employer to establish a disabling conflict. The Board did not hold that evidence regarding a union's campaigning tactics is irrelevant, nor did the Board hold that evidence that a "salter" who may have engaged in "bad faith" activity in some other situation at some other place with some other employer in the past is always immaterial. Rather, the Board merely found "no merit in [Casino's] contention that the [ALJ] improperly limited its ability to prove that [the union organizers] were not protected by the Act." *Casino Ready Mix*, 2001 WL 1039902, at *4 n.7 (citing *Town & Country*, 516 U.S. 85; *M.J. Mech. Servs.*, 324 N.L.R.B. at 813-14; *Braun Elec.*, 324 N.L.R.B. at 3). As noted above, neither *Town & Country, M.J. Mechanical Services,* nor *Braun Electric* endorses the contested views of the General Counsel or the ALJ, so the Board apparently knew what it was doing in citing those authorities, and not the ALJ. The Board obviously meant only to apply the principles enunciated in those cases to uphold the ALJ's evidentiary exclusion.

On the merits, we can find no fault with the Board's judgment. The evidence that the employer proffered did not purport to show a *Sunland Construction* economic strike situation, or any other potentially disabling conflict, such as subterfuge, bad faith, sabotage, or an attempt to drive the employer out of the area or out of business. Thus, even if the

evidence were admitted, it would not have been sufficient to establish a disabling conflict.  *See Casino Ready Mix*, 2001 WL 1039902, at *4 n.7.

## B.  Bale's Antiunion Threat

Casino next objects to the Board's finding that Bale's antiunion threat was an ULP.  Petitioner argues that, because the complaint did not allege that Bale's statement violated the Act, and because the General Counsel did not move to amend the complaint to include such an allegation, petitioner was deprived of a full and fair hearing on the issue.  We disagree.  On the record at hand, the Board findings that Bale's statement violated § 8(a)(1) and also demonstrated petitioner's animus against the Union, a factor relevant to the complaint's § 8(a)(3) allegations, were fully justified.

The Board's Rules and Regulations require that the complaint include "[a] clear and concise description of the acts which are claimed to constitute unfair labor practices," 29 C.F.R. § 102.15(b).  Although Bale's statement was not specifically alleged in the General Counsel's complaint, "[i]t is well settled that the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated." *Pergament United Sales*, 296 N.L.R.B. 333, 334 (1989), *enf'd*, 920 F.2d 130 (2d Cir. 1990); *see also Tasty Baking Co. v. NLRB*, 254 F.3d 114, 122 (D.C. Cir. 2001).  Consistent with this established legal standard, the Board properly held that a close connection existed between Bale's statement and the subject matter of the complaint, and that petitioner had an opportunity to litigate the issue fully.  *Casino Ready Mix*, 2001 WL 1039902, at *2-*3.

The close connection between Bale's statement and the subject matter of the complaint is demonstrated in three ways.  First, the complaint alleged that supervisor Larry Hildebrand threatened that Casino "would close down its Nevada operation to avoid unionization." *Id.* at *1.  Thus, Casino knew that it was being charged with a § 8(a)(1) violation for the same kind of threats that Newcomb's testi-

mony suggested that Bale had made. Second, the complaint alleged that "Bale was the president of the Company, a statutory supervisor, and an agent acting on [petitioner's] behalf." *Id.* at \*2. This put petitioner on notice that it could be held accountable for Bale's actions. Finally, Bale's threats were obviously relevant to the complaint's allegations that petitioner discriminated against Union members in its employment policies, as the threats "clearly demonstrated union animus." *Id.* These circumstances clearly support the Board's finding that a close connection existed between Bale's threats and the subject matter of the complaint.

Petitioner also had the opportunity to litigate the issue fully. Petitioner did not object to Newcomb's testimony, and had an opportunity to cross-examine Newcomb about Bale's statement. This furnished ample opportunity to litigate the issue. *See Williams Pipeline Co.*, 315 N.L.R.B. 630, 630 (1994) ("At the hearing, there was no objection to [the accusing witness's] testimony, and the Respondent had an opportunity to cross-examine the witness and further explore the issue. Accordingly, we find that the issue was fairly and fully litigated."). It may be that, in not questioning Newcomb, Casino's counsel made a calculated decision not to pursue the matter during the hearing, either because counsel knew that what Newcomb alleged was in fact true or because counsel hoped to discredit Newcomb's testimony by reference to other evidence in the record. In any event, it is clear that Casino purposely allowed Newcomb's testimony to stand unchallenged, without either objection or cross-examination. When such a decision backfires, a party cannot be heard on appeal to claim that it was denied a "fair hearing." The claim rings hollow.

Finally, petitioner's contention that the Board did not adhere to its precedent in *Germinsky Electrical Co.*, 331 N.L.R.B. 1365 (2000), is without merit, because that case dealt with an entirely different issue. Petitioner argues that, in dismissing allegations of discriminatory refusal-to-hire union applicants, the ALJ in *Germinsky* refused to consider a letter written by the company president as evidence of anti-union animus, because it was not alleged to violate § 8(a)(1).

*Id.* at 1366. A three-member panel of the Board unanimously upheld the ALJ's dismissal of the complaint against the employer, and only one of the three members – then-Chairman Truesdale – chose to disavow the ALJ's refusal to consider the letter. *Id.* at 1365 n.1. Thus, petitioner states that "[i]t is logical to infer that the majority of the Board approved of the judge's refusal to consider such evidence to prove antiunion animus." Br. of Petitioner at 34. The Board saw no need to explain or otherwise address *Germinsky* in its opinion in this case. This is hardly surprising, for even a cursory examination of *Germinsky* reveals that it does not support petitioner's attempted use of the case.

In *Germinsky*, the company president met with union representatives, and claimed "that they told him that the [union] was going to step up its union activity and that if Germinsky did not sign a contract, they were going to put his company out of business." *Germinsky*, 331 N.L.R.B. at 1366. Thereafter, the president sent out a letter to his employees "which asserted that the [union] was trying to coerce the Company into signing a contract and that it was out to destroy the Company if necessary." *Id.* The ALJ stated that, given the context in which it was sent, the letter did not demonstrate union animus. *Id.* A majority of the Board accepted this conclusion. Thus, the circumstances in *Germinksy* – focusing on the appropriate use of the employer's *protected speech* to provide evidence of antiunion animus – are far different from the circumstances here. This case involves an employer's statement that clearly reflects an antiunion threat and plainly bears a close connection to the subject matter of the complaint. Thus, *Germinsky* provides absolutely no support for petitioner's position.

## C. The ALJ's Review of the Record

Last, and certainly least, petitioner contends that the Board erred in holding that the ALJ had made an independent analysis of the factual and legal arguments in this case. We find no merit in this contention. Indeed, the record in this case makes it perfectly clear that the Board itself reviewed the record with care and reached well-informed judg-

ments with respect to all of the challenged ULPs. The Board also properly discounted any missteps by the ALJ. On the record at hand, there is no serious doubt that the *Board's findings*, which are before the court on review, are supported by substantial evidence and are fully consistent with controlling law.

Petitioner's attempts to show otherwise are frail. For example, petitioner points out that the ALJ's reliance on the testimony of employee Paul Swisher to find that Supervisor Hildebrand had made antiunion threats made no sense. The ALJ had declared to counsel for both sides that Swisher was simply not a credible witness; yet, the ALJ relied solely on Swisher's testimony to find that Hildenbrand's statements violated § 8(a)(1). However, the Board found "that Swisher's testimony remains discredited, and thus the evidence regarding statements made by Hildebrand is no longer competent to support the alleged violations of Section 8(a)(1)." *Casino Ready Mix*, 2001 WL 1039902, at *2. The Board thus dismissed those allegations.

Petitioner also points out that the ALJ's decision incorporated substantial portions of the General Counsel's brief, suggesting that the ALJ's impartiality was subject to question. The Board specifically addressed this matter:

> We observe that the judge's decision incorporates substantial portions of the Charging Party's post-hearing brief. While this practice may raise questions about the independence of a judge's analysis, it is not inherently prejudicial or otherwise reversible error. Based on a careful review of the record, we are satisfied that the judge provided an independent analysis of the factual issues and legal arguments in this case. Accordingly, we find that disregard of his findings is not warranted. See *Waterbury Hotel Management LLC*, 333 NLRB No. 60, slip op. 1 (2001), and cases cited there.

*Casino Ready Mix*, 2001 WL 1039902, at *1 n.2. The Board's holding on this issue is supported in the record and perfectly reasonable.

Petitioner nonetheless argues that the Board's decision not to disregard the ALJ's findings was a departure from *Waterbury Hotel*, 2001 N.L.R.B. LEXIS 136 (Mar. 9, 2001). Petitioner notes that the Board in *Waterbury Hotel* stated that "[i]t is the special function of the administrative law judge to prepare for the Board an independent and careful analysis of the factual issues and legal arguments in the case over which the judge presides." *Id.* at *4. The ALJ in *Waterbury Hotel* had, like the ALJ here, extensively relied on the General Counsel's brief in making his factual findings. In determining that the ALJ had performed the independent and careful review expected of him, the Board specifically pointed to a portion of the judge's decision that "manifest[ed] full consideration of the record, witness credibility, and the posthearing briefs filed by both the General Counsel and the Respondent." *Id.* at *6. Moreover, the NLRB noted that the employer had "cite[d] no specific basis, apart from the challenged decisional practice, to disbelieve the judge's declaration of a full and independent review." *Id.* Petitioner here argues that the NLRB departed from the teachings of *Waterbury Hotel* in this case, because the Board did not specifically point to any portion of the ALJ's decision to support its assertion that the ALJ had "provided an independent analysis of the factual issues and legal arguments," and because the employer had provided specific reasons to disbelieve the ALJ's declaration of a full and independent review.

Petitioner's argument lacks merit. The major problem with petitioner's argument is that it reads far too much into *Waterbury Hotel*. The holding in that case did not set forth a "mandated" process of analysis, nor did it claim that the factors relied upon there were necessary to establish the independence of the ALJ's analysis. Instead, the Board resolves such questions on a case-by-case basis. *Waterbury Hotel* merely supplied an analysis of why, in that particular case, the Board determined that the ALJ had conducted a sufficient review of the record.

In the present case, we find that the Board dealt fairly with petitioner's challenges to the ALJ's review of the facts. The Board adopted the ALJ's findings only to the extent that they

were consistent with the Board's Decision and Order. The Decision and Order reflects the Board's own independent review of the record, which the Board affirmatively states that it conducted. *Casino Ready Mix*, 2001 WL 1039902, at *1 n.2. The Board's correction of the ALJ's mistake with respect to Swisher's testimony supports the Board's claim that it conducted an independent review. Moreover, the Board's opinion carefully discusses the disputed ULPs and the factual predicates for each. *Id.* at *3-*5. In short, we can find no merit in petitioner's argument.

## III. CONCLUSION

For the foregoing reasons, we deny the petition for review and grant the NLRB's cross-application for enforcement.