Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 11, 2003      Decided March 28, 2003

No. 01-1393

CONTRACTORS' LABOR POOL, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
AFL–CIO, LOCAL 46, *ET AL.*,
INTERVENORS

————

On Petition for Review and Cross–Application
for Enforcement of an Order of the
National Labor Relations Board

————

*Robert W. Tollen* argued the cause and filed the briefs for petitioner.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*William M. Bernstein*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith Jason*, Attorney. *Deirdre C. Fitzpatrick* and *Julie F. Marcus*, Attorneys, entered appearances.

*Robert D. Kurnick* argued the cause for the intervenor unions and *amicus curiae* International Brotherhood of Electrical Workers, AFL–CIO in support of respondent. With him on the brief was *David Hannah*.

Before: EDWARDS and ROGERS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Contractors' Labor Pool (CLP) challenges a Board determination that CLP's policy of refusing to hire applicants whose recent wages were 30% higher or lower than its starting wages was discriminatory within the meaning of § 8(a)(3) of the National Labor Relations Act. Also challenged is the Board's conclusion that CLP discriminated against several paid union organizers in assignment because, according to petitioner, they were not its "employees" or, alternatively, because of a "disabling conflict," they were engaged in unprotected activity. We agree with petitioner's first challenge but reject its second and therefore grant the petition in part and deny it in part.

**I.**

CLP, a nonunion company, supplies, on a temporary basis, several thousand construction workers a year to various contractors in Arizona, California, Oregon, Washington, Nevada, and Colorado.[1] It operates 15 offices in those states.

---

[1] The ALJ's list of states, which takes account of CLP's offices at the time of the hearing (held on various days between September 11, 1995 and November 8, 1996), does not include Colorado. How-

Essentially, it employs a permanent labor pool from which contractors draw skilled and unskilled workers as needed. Its management believes that its success depends on its ability to keep a large number of reliable employees. Accordingly, it has adopted various measures to improve employee retention (and productivity) since its inception in 1987.

For instance, it sought to improve its applicant screening process in the early 1990s by examining applicants' driving records and references with greater care. And beginning in 1989, an applicant was asked to specify an acceptable hourly rate. If the figure was substantially higher than CLP was willing to pay, that person would not be hired for it was assumed that the employee would soon become dissatisfied and quit. Petitioner's CEO Thomas McCune testified that short-term employees, moreover, were prone to substandard work and accidents.

In 1993 the company conducted a worker retention study that served to further refine petitioner's hiring policy. The available data indicated that workers who had previously earned wages that were either 30% higher or lower than CLP's wages would be significantly less likely to work for the company for 100 hours or more within a 40–day period. The study predicted that adopting a 30% rule (precluding applicants whose prior wages deviated by 30% from CLP's starting salary) would eliminate some eligible workers. But it would cause CLP's important retention rate to rise 3.5%. Accordingly, in 1994 CLP adopted the 30% hiring standard. In the first full year following adoption of the 30% rule the percentage of applicants deemed ineligible for hire increased

ever the Board granted CLP's motion to add to the record *Contractors Labor Pool, Inc. (IBEW Local Union 68)*, 1999 WL 33453678, (July 21, 1999), which addresses similar unfair labor practice charges raised against the company's Denver, Colorado operations. In addition, the ALJ recognized that CLP has recruited new employees from neighboring states, such as Idaho, but the record does not indicate that it has offices there. *See In re W.D.D.W. Commercial Systems & Investments, Inc.*, 335 N.L.R.B. No. 25, 2001 WL 1011927, at *91 (Aug. 27, 2001).

from 70 to 75%, but CLP's retention rate increased from 57.6 to 63.9%, workers compensation costs were significantly reduced, and the company's safety record showed substantial improvement.

The ALJ specifically determined that petitioner's implementation of its 30% rule was *not* motivated by antiunion animus; instead CLP had pursued a legitimate business objective. The Board adopted that recommended finding. Nevertheless, the ALJ and the Board concluded that petitioner's 30% rule operated to exclude workers in a number of Western labor markets who previously had worked on jobs covered by a union collective bargaining agreement.[2] The effect was most pronounced in Southern California; CLP's top hourly rate for journeymen electricians was $18.00 in that market whereas the average union scale was $26.00. In Seattle, on the other hand, the ALJ concluded that the differential was less.

Petitioner contends that union rates are not 30% higher than CLP's in Idaho, parts of Washington state and Denver, Colorado. It cites an ALJ determination to that effect—at least respecting Denver—in a companion case against it, in which the judge recommended against a finding of an § 8(a)(3) violation. *See Contractors Labor Pool, Inc. (IBEW Local Union 68),* 1999 WL 33453678, at \*11. However, it does not appear that it produced clear evidence as to its rates in Idaho and central and western Washington. The Board's brief is virtually silent on the matter and its decision, without referring to the Denver case, only said that "it is no defense that a few union members may have passed CLP's 30% rule." *In re W.D.D.W. Commercial Sys.,* 2001 WL 1011927, at \*5, n.17.

The ALJ concluded, and three of the four Board members agreed, relying upon the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26 (1967), that CLP

---

[2] The consolidated charges in this case were brought by local unions in two of the states of operations: Orange County in Southern California, San Mateo and Contra Costa counties in Northern California, and the Seattle area in Washington.

violated § 8(a)(3) because the 30% rule excluded previously organized workers and therefore had "inherently destructive" effects on employees' § 7 rights. Chairman Hurtgen dissented from the Board's order because, in his view, there was no showing of discrimination or unlawful motive.

## B.

The second issue in the case—the Board's finding of petitioner's discriminatory assignment of two union organizers—also has its genesis in the early 1990s when Local 441 began targeting CLP as part of the broader campaign against nonunion employers on the West Coast. The Local employed what is called "salts," paid organizers sent to job sites ostensibly to obtain employment but with the objective of inducing union organization. The ALJ determined that some of these salts were instructed not only to uncover unfair labor practices but to provoke them. As one organizer put it, their presence on a jobsite was not necessarily "to build their damn job," but if organizing tactics were unsuccessful "to bankrupt the contractors." *In re W.D.D.W. Commercial Sys.*, 2001 WL 1011927, at *13. Local 441 issued several newsletters boasting of successful efforts in getting some of the larger nonunion contractors to close their businesses. CLP claims to have learned about the full extent of Local 441's salting activities only at the unfair labor practice hearing in this case.[3]

As part of this salting campaign Local 441 President Vaughn Hedges applied for employment with CLP in 1992 without making the company aware of his union affiliation. After successfully passing the screening test he was referred to CLP customer Aztech Electric in California and reported

---

[3] However, the ALJ found that CLP had first learned of Local 441's salting activities somewhat earlier because of an unfair labor practice charge against another company. In response, CLP distributed guideline literature to its employees on how to deal with such campaigns through lawful means, recognizing Local 441 specifically as a union intent on generating unfair labor practice litigation to hurt the company financially.

to its construction site in November 1992. Four days later he was released from work at Aztech by foreman Adamik. Aztech claimed that Hedges had completed a particular project and it wanted to give additional work to some regular employees. After being told that he was being laid off, Hedges started talking about the union and how it would be best for the employees if Aztech Electric unionized. He then signed his timecard, left the site, and went to his truck, where he picked up some union literature and began to distribute it to other electricians. Adamik then told Hedges to leave the jobsite and Hedges complied.

Hedges did not talk to CLP about the incident until the next day. The staff manager Margo Nezrab accused Hedges of distributing literature on CLP's time after he had been laid off. Hedges admitted this was true. Nezrab then added that CLP gets contracts from companies like Aztech precisely because it is a nonunion employer. She made it clear that union literature was not welcome on the job, but did suggest that Hedges would continue to get work if available. Hedges received his paycheck later that week. CLP never contacted him regarding work again, and testimony revealed that a "DNU (Do Not Use) until further notice" was entered into Hedges' CLP computer file after the episode. *In re W.D.D.W. Commercial Sys.,* 2001 WL 1011927, at *61.

Shawn Smith was also a Local 441 member at the time these events occurred. In September 1992, Local 441 Business Manager Doug Saunders told him to apply with CLP. He applied and was accepted for employment. Smith was let go from his second assignment with Aztech Electric on November 25, 1992, the day after Hedges was released, also because his job had been completed. The ALJ *noted* that Aztech foreman Adamik was aware of his union affiliation and intent to distribute union literature. Smith, like Hedges, received a "DNU" code and was not referred another job.

Based on this record, the ALJ determined that CLP's actions against these employees would be violative of § 8(a)(1) and (3) of the Act, but decided that because Local 441 paid union organizers purposed to engage in activities

inimical to the employers' operations, a "disabling conflict" had been created. Accordingly, the salts were no longer "employees" within the meaning of § 2(3) of the Act. The Board majority disagreed, holding that even if a disabling conflict had existed between Local 441 and CLP, which would mean their activity was "unprotected," the salts nevertheless had statutory employee status under *NLRB v. Town & Country Elec.*, 516 U.S. 85 (1995). The Board did not actually decide whether a disabling conflict had been created, because CLP had argued that salts were not statutory employees. Nevertheless, the Board went on to hold that even assuming *arguendo* that such a conflict existed,[4] and therefore the employees were engaged in unprotected activity, CLP did not demonstrate that it actually relied on this conflict in making its workplace decision; accordingly it could not raise it as a defense. (Chairman Hurtgen dissented only on the limited issue whether petitioner would be entitled to toll its backpay liability if it could show that once it discovered—at the unfair labor practice hearing—that Hedges and Smith were engaged in a disabling conflict it would not have assigned work to them). The Board ordered CLP to immediately reinstate the employees and make them whole for any losses suffered as a result of the discriminatory activity. And the order precluded the ALJ from opening up the record on the question of whether CLP could rely on the alleged

---

[4] The Board in dicta split on whether Local 441's behavior constituted a disabling conflict. *See, e.g., Sunland Construction Co.*, 309 N.L.R.B. 1224 (1992). Members Liebman and Walsh wrote separately to state their belief that Local 441's objective of generating litigation costs to cause CLP economic hardship did not amount to a disabling conflict, as long as it could not be shown that the salts were performing their jobs incompetently or engaging in "violence, sabotage, or disparagement of the business." *In re W.D.D.W. Commercial Sys.*, 2001 WL 1011927, at *15. Member Truesdale believed that if an employer can show that a union's "overarching objective" is to drive the company out of business, this goal would be "separate from and indeed in conflict with organizational objectives," and would entitle the employer to lawfully decline to hire, or retain its salts. *Id.* at *24 (Member Truesdale, concurring). Chairman Hurtgen agreed with Truesdale.

disabling conflict to toll backpay liability or for any other purpose.

## II.

### A.

Section 8(a)(3) makes it unlawful for an employee "by discrimination in regard to hire or tenure of employment or any term or condition of employment *to* encourage or discourage membership in any labor organization."  29 U.S.C.A. § 158(a)(3) (emphasis added).  Petitioner's main challenge is to the Board's determination that the 30% rule is "inherently destructive" of employees' § 7 rights to engage in protected activity, and therefore the employer's motive—whether to encourage or discourage membership in any labor organization—is irrelevant.  (All but two employees are affected by this determination.)  In support of this challenge, petitioner raises two arguments;  its 30% rule is not *inherently* destructive and, in any event, the Board's explicit finding that the employer's motivation, in adopting the 30% rule, was *not* tainted by antiunion animus makes a § 8(a)(3) violation analytically impossible.

The contention that the 30% rule is not inherently destructive is not completely fleshed out.

Petitioner points to Chairman Hurtgen's dissent which argued:

> [T]here is no showing of discrimination and thus the *Great Dane* analysis . . . does not even apply.  Respondent did not discriminate along section 7 lines.  Rather, Respondent CLP drew a line between high-wage earners and low-wage earners.  A high-wage earner with a non-union background (*e.g.*, based on skill and experience) was not eligible for hire.  A non-high-wage earner with a union background was eligible for hire.  Thus there was no discrimination prohibited by the Act.

*In re W.D.D.W. Commercial Sys.*, 2001 WL 1011927, at *28 (Chairman Hurtgen, dissenting).  We take the Chairman to

mean that the 30% rule, by itself, is not evidence of discrimination. If evidence had been presented that petitioner had adopted the rule for the very purpose of excluding applicants who had recently been covered by union contracts that would be a different matter, even if the operation of the rule excluded nonunion applicants as well. *See, e.g., Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1180 (6th Cir. 1985) (ordering general layoffs to discourage or retaliate against union activity is unlawful discrimination, even though some employees opposed to the union were laid-off as well). Moreover, it would seem to us that, at least theoretically, even a facially nondiscriminatory rule could be shown to invariably discriminate against union adherents and therefore might be termed "inherently destructive." Be that as it may, the Chairman's dissent does not squarely respond to the majority's contention that petitioner's rule is *inherently* destructive.

Petitioner emphasizes, however, that its company-wide 30% rule does not adversely impact applicants recently covered by union contracts in *all* of its labor markets. In other words, as we would re-characterize petitioner's argument, an employer's practice can hardly be described as *inherently* destructive of § 7 rights if its very destructiveness depends on independent variables—in this case actual evidence of the differential between petitioner's starting wages and the union wages in any particular locality. In the line of Supreme Court cases that have endorsed Board findings that particular practices are inherently destructive, and therefore § 8(a)(3) violations are made out without further evidence of an employer's antiunion animus, those practices can be regarded as having an *inevitable* negative impact on union adherents— without regard to any other facts. *See, e.g., NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26 (1967) (employer's refusal to pay vacation benefits accrued under terminated collective bargaining agreement to strikers while giving such payments to nonstrikers and replacements); *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693 (1983) (employer disciplined union officials more severely than other employees for participation in a work stoppage).

Still, given the record confusion as to the actual situation in petitioner's various labor markets as well as the imprecise

nature of both petitioner's and the Board's arguments on this issue, we think it preferable not to decide whether petitioner's practice could be described as inherently destructive and instead to pass on to petitioner's main point: that once the Board found explicitly that it had acted without an antiunion animus it was not possible for the Board to rely on the inherently destructive rationale.

The keystone of the Board's decision is its reliance on a discrete quotation from *Great Dane*:

> First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights *no proof* of an *antiunion motivation is needed* and the Board can find an unfair labor practice even if the employer introduces evidence that conduct was motivated by business considerations.

*Great Dane Trailers,* 388 U.S. at 34 (emphasis added). Drawing on this language the Board concluded it was free to hold that petitioner violated § 8(a)(3) even if it also found that petitioner's motive was blameless. The Board analogized its new legal rationale to "the disparate impact theory long applied in cases prosecuted under Title VII of the Civil Rights Act of 1964." *In re Commercial Sys.,* 2001 WL 1011927, at *5. Petitioner argues, and we agree, that the Board over reads the quotation from *Great Dane*, particularly in light of Supreme Court cases upon which *Great Dane* relied as well as cases that followed *Great Dane* and interpreted it.

In *Great Dane* an employer refused to pay strikers vacation benefits accrued under an expired collective bargaining agreement yet at the same time paying equivalent benefits to non-strikers. The Court of Appeals had refused to enforce the Board's order because of a lack of explicit evidence of the employers' antiunion motivation. The Supreme Court acknowledged that although the employer's practice was clearly discriminatory (on its face) and that it was obviously "capable of discouraging membership in a labor organization" the statute usually requires more—specific evidence of an antiunion purpose. *NLRB v. Great Dane Trailers*, 388 U.S. at

32. Reviewing its past cases, however, it pointed out that some conduct carries with it "unavoidable consequences which the employer not only foresaw but which he must have intended and thus bears its own indices of intent." *Id.* at 33 (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 231 (1963)).

That articulation makes clear that certain employer practices permit the Board to draw what is often referred to as a "secondary inference," *see, e.g., NLRB v. Universal Camera Corp.,* 190 F.2d 429, 432 (2d Cir. 1951) (Frank, J. concurring), of a discriminatory motive without any other evidence. To be sure, the quote upon which the Board relies, if read alone, could support the notion that, given certain conduct, an employer's motive is not relevant (although even the quote does not suggest that an explicit finding of a benign motive would be of no significance). However, the wording upon which the Board relies is in the paragraph immediately following the Court's discussion of its prior cases and its quote from *Erie Resistor*. Moreover, it is preceded by the sentence (which the Board does not quote): "[f]rom this review of our recent decisions, several principles of controlling importance here can be distilled." *Great Dane Trailers*, 388 U.S. at 34. It seems rather plain to us, therefore, that the Court did not mean to deviate from its past line of cases; when it said, "no proof of an antiunion motivation is needed." *Id.* It obviously meant no *further* proof of antiunion motivation, because if the employer's conduct was inherently destructive of union rights the Board could legitimately draw the inference that the employer had the proscribed motivation. If there were any doubt as to the Court's meaning in *Great Dane*—which we do not harbor—some years later in *Metropolitan Edison*, the Court described *Great Dane* as holding that "[s]ome conduct is so inherently destructive of employee interests that it carries with it *a strong inference of impermissible motive*." *Metropolitan Edison*, 460 U.S. at 701 (emphasis added).[5]

---

[5]    Of course, in most instances finding an employer's discriminatory intent against union workers in regard to hire or tenure of

The intervenors, but not the Board's decision, rely heavily on another rather old Supreme Court case, *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), to support the argument that a § 8(a)(3) violation can be made out without regard to an employer's motivation. There an employer enforced an overly broad no solicitation rule, (on nonworking time), which the Board held violated § 8(a)(1) because it interfered with union organizing attempts and therefore the employees' § 7 rights. Although the Court recognized that the employer's adoption and enforcement of the rule was not motivated by antiunion animus nor did it discriminate against union solicitation, it nevertheless affirmed the Board's holding that discharging employees who violated the rule was in turn a violation of § 8(a)(3). Subsequently, in *Radio Officers Union v. NLRB*, 347 U.S. 17 (1954), the Court "explained" its prior holding as follows: "Since the rules were no defense and the employers intended to discriminate solely on the ground of such protected activity, it did not matter that they did not intend to discourage membership since such was a foreseeable result." *Id.* at 46. The difficulty with that description is that the union solicitation was treated as protected activity as a matter of law; there was no showing that the employer's policy, which applied to all kinds of solicitation, was directed at union organization. To say then, that the employer "intended to discriminate solely on the grounds of . . . protective activity" is somewhat of a bootstrap analysis. *Id.*

Admittedly, the holding in *Republic Aviation* and the rather unsatisfactory explanation of that case in *Radio Officers* does not seem consistent with the *Erie Resister, Great Dane, Metropolitan* line of cases. We think *Republic Aviation* should be regarded as something of an anomaly. It stands for the limited proposition that if an employer adopts an illegal rule (a violation of § 8(a)(1) as a matter of law) and then fires an employee for transgressing the rule, it automati-

employment will demonstrate intent to encourage or discourage union membership. The facts in *Great Dane*, paying accrued benefits to nonunion employees while extinguishing the same benefits for union employees, are a prime example. *See Great Dane Trailers*, 388 U.S. at 32.

cally violates § 8(a)(3) even though it adopted the rule for wholly benign reasons. *See Republic Aviation*, 324 U.S. at 805.

In sum, the Supreme Court's long-standing interpretation of § 8(a)(3) is plainly at odds with the Board's reasoning in this case. Indispensable to a determination of a violation of § 8(a)(3)—at least outside the *Republican Aviation* exception—is a finding that an employer acted out of an anti- (or pro-union) motivation. Whatever legitimate inference that might be drawn from petitioner's adoption of the 30% rule the Board certainly cannot conclude explicitly that petitioner's motivation is benign and then hold that its practice independently violates § 8(a)(3).

It also follows that the Board may not draw support for its decision from the disparate impact line of cases under Title VII. For one thing, the statutory language is different. Title VII is broader than § 8(a)(3), for it is unlawful for an employer

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his *compensation*, *terms*, *conditions*, or *privileges* of *employment*, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees in any way *which would deprive* or *tend to deprive* any individual of *employment opportunities* or otherwise *adversely affect* his *status* as an *employee*, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e–2(a) (emphasis added). Second, as we have noted, the Court has never imported that concept into its cases interpreting § 8(a)(3). Indeed, the Court has been reluctant to extend the disparate impact theory to other laws prohibiting discrimination even where the statutory language bears greater resemblance. *See, e.g., Hazen Paper Company v. Biggins,* 507 U.S. 604, 610 (1993) ("Disparate treatment,

thus defined, captures the essence of what Congress sought to prohibit in the Age Discrimination in Employment Act"); *Alexander v. Sonderval,* 532 U.S. 275, 280–81 (2001) ("It is similarly beyond dispute . . . that § 601 prohibits only intentional discrimination . . . [although] regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups); *Washington v. Davis,* 426 U.S. 220, 247–48 (1976) ("We are not disposed to adopt this more rigorous standard [disparate impact] for the purposes of applying the Fifth and Fourteenth Amendments").

### III.

There remains the question whether the Board's finding that petitioner discriminated against Hedges and Smith is vulnerable. That finding led to a Board determination that petitioner violated § 8(a)(3) quite independently of its 30% rule. Petitioner's main argument, that these two "salts," and other paid organizers, as a matter of law were not petitioner's employees under the NLRA, but were rather employees of the union, is foreclosed essentially by the Supreme Court's opinion in *Town & Country Electric, Inc.*, 516 U.S. 85, 98 (1995), holding that paid union organizers are nevertheless employees under the Act. The Court explicitly contemplated that such organizers would engage in activities that might "hurt the company through unlawful acts," but it found that they were no less employees than "unpaid zealots" or "dissatisfied workers" engaged in such behavior. *Id.* at 96–97. *See also Tualatin Elec. v. NLRB*, 253 F.3d 714, 717 (D.C. Cir. 2001) (upholding NLRB order awarding backpay to union salts unlawfully fired by a nonunion contractor because of organizing activity).

To be sure, as we have recently noted in *Casino Ready Mix, Inc. v. NLRB,* No. 01–1471, (D.C. Cir. Mar. 14, 2003), the Board recognizes that employed union organizers might engage in conduct that raises a disabling conflict with their employer and is therefore unprotected. Whether the conduct

at issue in this case was unprotected, as we have noted, caused a sharp division amongst the Board members. But it is unnecessary for us to resolve the issue because we think the Board reasonably determined (all four members apparently agreed) that an employer who wishes to assert that its otherwise discriminatory conduct is justified by the employee's unprotected activity must show that the employee's unprotected conduct caused the employer's action. The Board likened a disabling conflict defense to a *Wright Line* defense whereby an employer must demonstrate initially in a mixed motive case, that it relied at least in part on considerations unrelated to protected activity in imposing discipline on an employee. *See Wright Line, a Div. of Wright Line Inc.*, 251 N.L.R.B. 1083, *enf'd* 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982). Since petitioner never asserted that it was aware of Hedges' and Smith's "salt" status (or any allegedly disabling conflicts) at the time it engaged in discriminatory conduct this defense was unavailable.

During the unfair labor practice hearing, however, petitioner, as we have noted, did hear testimony which showed that Hedges and Smith were salts—although we are not told how they interacted with other salts or what was their actual conduct. From that testimony, alone, petitioner alternatively argues that its backpay liability should be tolled from the time it discovered Hedges and Smith were salts. This is an untenable proposition. An employee does not lose his protected status *merely* because he is a salt. Rather, he may lose it if he engages in unprotected activity that emanates from disabling conflicts arising in connection with salting. *See Casino Ready Mix*, No. 01–1471, slip op. at 12. Maybe this is what petitioner meant to say in arguing that backpay should be tolled. We will assume as much in addressing this claim.

In support of this argument, petitioner relies on Chairman Hurtgen's dissent that argued petitioner should be at least entitled to litigate that issue in a subsequent backpay pro-

ceeding—a position that the majority rejected. Whatever the merits of the Chairman's position,[6] we may not consider it— let alone the broader argument petitioner makes—because we are without jurisdiction to consider the issue. As the intervenors point out, this tolling question was not raised to the Board and "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C.A. § 160(e).

Petitioner contends that Chairman Hurtgen satisfied this requirement by raising the backpay tolling issue in his dissent. The company relies on § 10(e)'s passive voice as an indication that Congress did not require that the parties themselves actually raise the issue before the Board, as long as the members themselves engage in its discussion. CLP, however, offers no support for its view and probably for good reason—there is not any. The company had full opportunity to present the argument regarding backpay tolling in a motion for reconsideration, and the mere inconvenience of severing the issues or delaying a petition for review does not constitute an extraordinary circumstance. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982) (holding that an employer cannot challenge the Board's *sua sponte* conclusion that its conduct did not violate § 8(b)(4)(A) because a motion of rehearing or reconsideration could have been filed); *see also Alwin Mfg. Co., Inc. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999).

---

[6] We do not believe the majority adequately responded to Chairman Hurtgen's dissent on the tolling issue. The three members argued that CLP already had the opportunity to prove that it relied on a disabling conflict in defending against the unfair labor practice charges in this proceeding, and precluded CLP a second opportunity to do so on remand or in subsequent compliance proceedings. *See In re W.D.D.W. Commercial Sys.*, 2001 WL 1011927, at *9, n.29. The difficulty with that response is it confuses the petitioner's failure to demonstrate that it had initially relied on the alleged disabling conflict with the entirely separate tolling question.

\* \* \* \*

For the foregoing reasons, the petition for review is partially granted and partially denied, and the Board's cross-application for enforcement of its order is partially granted.

*So ordered.*