**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2003**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIONAL LABOR RELATIONS
BOARD,

      Petitioner,

    v.

INTERSTATE BUILDERS, INC.,

      Respondent.

No. 02-9507

---

**APPLICATION FOR ENFORCEMENT OF AN ORDER
OF THE NATIONAL LABOR RELATIONS BOARD
(Nos. 17-CA-19586, 17-CA-19620, 17-CA-19683)**

---

Charles W. Ellis, Oklahoma City, Oklahoma, appearing for Respondent.

David B. Schwartz, Attorney (David Habenstreit, Supervisory Attorney, Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, with him on the brief), National Labor Relations Board, Washington, DC, appearing for Petitioner.

---

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS** and **McCONNELL**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

This matter is before the court on the National Labor Relations Board's ("NLRB") petition for an order enforcing its July 31, 2001, order. The order concludes that Interstate Builders, Inc. ("Interstate") committed unfair labor practices in Oklahoma in violation of sections 8(a)(1) and (3) of the National Labor Relations Act (the "Act" or "NLRA"), codified at 29 U.S.C. § 158(a)(1) & (3). The Board adopted the rulings, findings, and conclusions of the administrative law judge ("ALJ") who conducted hearings on the alleged unfair practices. We exercise jurisdiction pursuant to 29 U.S.C. § 160(e) and grant enforcement of the order.

### BACKGROUND

This case arises from an attempt by the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers Local 48 (the "Union") to unionize the employees at Interstate. Based solely on credibility determinations, the Board found that Interstate coercively interrogated applicants and employees about their union membership and activities, created the impression that employees' union activities were under surveillance, threatened to impose more onerous working conditions if the employees unionized, implied that support of a union would be futile, and violated sections 8(a)(1) and (3) of the Act by imposing more onerous working conditions on – and ultimately laying off – employee David Hibdon. Interstate does not object to these determinations.

NLRB July 31, 2001 Final Order ("NLRB Order") at 1 n.3. We therefore grant the Board's application for enforcement of the general cease-and-desist provisions and the remedy provisions relating to Mr. Hibdon.

We address below Interstate's objections to enforcement of the order requiring Interstate to reinstate John Norman and make him whole as to backpay and other benefits, and to offer John Buntin, Derrick Haggard, Wesley Stillsmoking, and Floyd Woods the jobs for which they attempted to apply (or to substantially equivalent positions) without prejudice to seniority or other benefits and to make them whole "for any loss of earnings and other benefits suffered" as a result of Interstate's refusal to hire them. *See id.* at 3.

In February 1998, after eight or ten of his employees had signed union cards, Bill Napier, Interstate's president, met with the Union to discuss voluntary unionization of the business. Napier, a former union member himself, told the Union that he would sign a post-dated agreement (dated three months ahead) to unionize, but Union officials refused the offer. The Union immediately assigned the unionized Interstate employees to jobs with Union contractors competing with Interstate, causing them to leave Interstate's employ and raising concerns that the Union would try to run Interstate out of business.

Interstate advertised for replacement certified welders or ironworkers in February and May of 1998. During this period, the Union continued to engage in

-3-

an active campaign to organize employees at Interstate. Norman, a full-time Union employee and organizer who is also a journeyman ironworker, applied for an ironworker job with Interstate on February 23, noting on his application that he worked for the Union as an organizer. Norman listed $22.57/hour on his application as "salary expected." According to Norman, Tommy Young, Interstate's supervisor, interviewed him and, holding his thumb and index fingers close together, stated that Interstate was "that close to signing a contract" with the Union. Young also stated that Napier needed more time before signing a union contract.

It is undisputed that Young told Norman that Interstate paid $16/hour, not $22.57/hour, and Young memorialized that statement by writing "$16.00 an hour, no benefits" in the corner of Norman's application. Norman's reply was, "[D]o you want me to leave . . . . Or can I sit down and talk?" Norman stated that when he asked if Young was going to hire him, Young responded, "no." According to Young, Norman asserted that "if he could not organize us, he was going to take our employees." Norman did not deny making that statement. Young testified that he did not hire Norman because Norman demanded more on his application than the $16/hour Interstate was offering for the position.

On March 2, Norman filed a complaint alleging that Interstate had committed unfair labor practices, including unlawful interrogation of an unnamed

employee about his union activity and subsequent refusal to provide work to the employee. Norman did not, however, allege that he had been unlawfully denied employment on February 23.

In response to notice of the interrogation charge, Interstate called Norman on March 17, offering him the job for $16/hour, which Norman accepted. Norman was not available to work until March 23; he started work on Tuesday, March 24. Richard Hopper was assigned as his helper, grinding Norman's welds. During the course of their two and one-half days of working together, Norman convinced Hopper to join the Union. Hopper testified that Norman "hound[ed]" him up to four times a day while they worked together, telling him to leave Interstate because the Union needed him.

Norman took half a day off work on Thursday, March 26 for a doctor's appointment. On March 27, a Friday rain day that closed the job site, Norman saw Hopper at the Union offices, and the Union sent Hopper to work for a Union contractor instead of Interstate. On Monday, March 30, when Norman returned to work at Interstate for his first full week on the job, Harry Young, Interstate's job foreman and Tommy Young's brother, asked where Hopper was. Norman told him that he had "signed [Hopper] to the Union" and that Hopper would not be returning to work at Interstate. Norman then complained that he could not do the work assigned to him alone and asked for another helper. Young refused, saying

that Norman would just organize whoever he hired and Interstate would lose him. It is undisputed that Norman replied, "That's my job. I'm a Union organizer." It is also undisputed that Norman then demanded a raise, stating that the job was worth $22.57. Young told him that Interstate was not offering that wage. According to Young, Norman said he had to have $22.57/hour or he could not work. According to Norman, Young said, "I ain't putting up with this shit" and told Norman to go pick up his final paycheck.

John Dyer, a disinterested witness who overheard part of the conversation, corroborated Young's version of the incident. According to Dyer, Norman became adamant, erroneously claimed that $22/hour was the prevailing job wage for the job, and implied that if he didn't get a $6/hour raise, he would quit and walk off the job. Dyer also testified that he did not hear Norman state that he would quit if he did not receive the requested pay raise.

Norman testified that he complained about the welding leads on the job to Young immediately after Young told him to pick up his paycheck, implying that the equipment violated OSHA requirements. Norman also claimed to have backed down and told both Harry and Tommy Young that he would work for $16/hour, an assertion the Youngs denied at trial.

Norman returned to his full-time job at the Union and filed an amended charge for unfair labor practices against Interstate on April 1. In this amended

charge, he alleged for the first time that Interstate had discriminated against him since February 23 by refusing to consider him for employment. He also filed a separate charge on the same day, alleging that he was fired for his union activity.

Hopper testified that, after he had joined the Union and worked on a couple of union jobs, Norman called him in and asked him to work for Interstate again and "get them on [OSHA] violations and call [Norman] every day at noon . . . [i]f I found any violations." He testified that Norman told him that if the Union could not make Interstate go union, they wanted to put Interstate out of business. Hopper's testimony was unrebutted.

The Union mailed ironworker job applications of Union members to Interstate in April. In a letter dated April 9, 1998, Napier informed the Union in writing that it dealt directly with job applicants and did not recognize the Union as the representative of job applicants. Napier invited any individual to come to Interstate's office, submit an application, and engage in a short interview. On May 10, Interstate ran another ad seeking ironworkers. Norman spoke to Buntin and Haggard (whose applications the Union had sent to Interstate in April) and Woods and Stillsmoking, all members of the Union, asking if they "were willing to serve as volunteer organizers." When they agreed to apply for jobs at Interstate, he had them fill out job applications, putting "ironworker" and "volunteer organizer" in the spaces under "employment experience." Norman

then took the men to Interstate's office on May 12.

Norman entered Tommy Young's office with Buntin, an executive board director for the Union. He told Young that he had four union men who wanted to fill out applications in response to the ad. Young told Norman that Interstate did not want union representation and asked whether Norman had received Napier's April 9 letter informing the Union it did not accept applications from the Union. Norman told Young, "We're not union representation. These guys will work for what you put in the paper." Buntin then asked Young, "You don't need any help?," to which Young replied, "No." Buntin then reminded Young about the advertisement, and Norman said, "You're not going to let these guys put their applications in, Tommy?," to which Young replied, "No." Norman attempted to hand Young the completed applications; Young refused to accept, telling the applicants to "file another goddamn complaint" instead. Norman later acknowledged that he "spoke for" some of the men at this meeting.

Tommy Young apparently contacted legal counsel after the incident, then wrote a letter to Norman at his Union office the same day. In it, Young explained that his impression had been that Norman had sought recognition of the Union as the collective bargaining representative of the four applicants. He repeated Napier's explanation that Interstate did not recognize the Union as the representative of job applicants. The letter stated that if any of the individuals

who had come to the office wished to make application without conditioning the application on Interstate recognizing the Union as their collective bargaining representative, they should return with their applications and Interstate would consider them for employment if they were qualified. The letter also stated that Young had recently discovered that Norman had told agents of the NLRB that he was willing to work for $16/hour, contrary to his previous statement on March 30 that he required $22.57/hour. He told Norman that, if he was willing to work for $16/hour, to report for work the next morning. Norman denied having seen this letter. Interstate hired several ironworkers between May 18 and September 15.

Norman filed another charge of unfair labor practices with the Board on May 12 regarding Interstate's refusal to hire the four men. All the charges were consolidated, and the ALJ held a hearing in September 1998, from which we have summarized the testimony set forth above.

Before the ALJ, Interstate officials testified that Norman was not discharged. Instead, they testified that Norman quit his employment at Interstate because he was not given the requested pay raise. The ALJ rejected Interstate's testimony, finding instead that Interstate discharged Norman because of his "organizing efforts." Interstate now concedes that it discharged Norman, arguing on appeal that the order should not be enforced because Norman's discharge was for cause. In addition, Interstate contends that the Board erred in upholding the

ALJ's finding that Interstate violated the Act by refusing to hire Buntin, Haggard, Stillsmoking, and Woods on May 12, 1998.

DISCUSSION

I.     Overview of Applicable Law

    A.     *"Unfair Labor Practice" Under the NLRA*

Section 8(a) of the NLRA prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).  In general, for both refusal-to-hire and wrongful-termination cases, the critical question is the company's motivation for the challenged conduct; specifically, we focus on whether "anti-union animus" motivated that conduct.  *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983), *overruled in part on other grounds by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276-78 (1994); *MJ Metal Prods., Inc. v. NLRB*, 267 F.3d 1059, 1065-66 (10th Cir. 2001).  As we have previously recognized, "[a]n employer's antiunion motivation often may be proven only by circumstantial evidence."  *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996).  Thus, in determining a company's motivation, "[t]he NLRB may consider factors such as the employer's knowledge of the employee's union activities, the employer's commission of other unfair labor practices, the timing of the employer's action, and the

-10-

credibility of its explanation of the reasons for the discharge." *MJ Metal Prods.*, 267 F.3d at 1065.

We have previously approved the NLRB's burden-shifting approach in section 8(a) cases: "Initially, the [NLRB's] General Counsel must establish that the employee's protected conduct was a substantial or motivating factor in the discharge decision; thereafter the burden shifts to the employer to show that it would have reached the same decision absent the protected conduct." *Ready Mixed Concrete*, 81 F.3d at 1550 (internal quotation marks omitted).

Thus, an employer "does not violate the NLRA . . . if any anti-union animus that he might have entertained *did not contribute at all* to an otherwise lawful discharge for good cause."[1] *Transp. Mgmt.*, 462 U.S. at 398 (emphasis added). As we have previously noted, "[t]he Act does not allow [the] Board to act as a 'super-employer' in derogation of the right of the employer to select its employees or discharge them." *NLRB v. First Nat'l Bank of Pueblo*, 623 F.2d 686, 693-94 (10th Cir. 1980) (citations omitted). "The statute does not touch the normal exercise of the right of the employer to select its employees or to discharge them. It is directed solely against the abuse of that right by interfering

---

[1] This follows from 29 U.S.C. § 160(c), which provides: "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been . . . discharged, or the payment to him of any back pay, if such individual was . . . discharged for cause."

-11-

with the countervailing right of self-organization." *Phelps Doge Corp. v. NLRB*, 313 U.S. 177, 187 (1941) (quotation omitted). In other words, "what the Act purports to do is simply to withdraw a range of factors from the employer's consideration when exercising his otherwise unfettered discretion to discharge an unwanted employee. In short, sections 8(a)(3) and (1) require that an employer not terminate an employee out of hostility toward the latter's union activities." *First Nat'l Bank of Pueblo*, 623 F.2d at 693-94. In sum, where "anti-union animus *actually contributed* to the discharge decision," an employer violates the NLRA. *Transp. Mgmt.*, 462 U.S. at 398 (emphasis added).

B.    *Standard of Review*

"We will grant enforcement of an NLRB order when the agency has correctly applied the law and its findings are supported by substantial evidence in the record as a whole." *Miera v. NLRB*, 982 F.2d 441, 444 (10th Cir. 1992). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ready Mixed Concrete*, 81 F.3d at 1551 (internal quotation marks omitted). Although substantial-evidence review is "quite narrow," *id.*, in conducting our review, we must keep in mind that "Congress has imposed on [us] responsibility for assuring that the Board keeps within reasonable grounds," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951). As the Supreme Court has previously noted:

-12-

The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . .   Congress has . . . made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id*. at 488.  That said, "[w]e may not overturn a Board decision just because we might have decided the matter differently; rather, our function is to ascertain that 'the Board acts within reasonable bounds and that the supporting evidence is truly substantial.'" *Ready Mixed Concrete*, 81 F.3d at 1551 (internal quotation marks and quotation omitted).

In this case, Interstate challenges three aspects of the NLRB's enforcement petition:  first, the ALJ's revocation of Interstate's subpoena; second, the NLRB's conclusion that Interstate's termination of John Norman violated the NLRA; and, third, the NLRB's conclusion that Interstate's refusal to hire the four applicants of May 12 violated the NLRA.  We consider each question in turn.

II.     Whether the NLRB Abused Its Discretion in Upholding the ALJ's Revocation of Interstate's Subpoena.

A.     *Abuse of Discretion*

We review the Board's rulings on subpoenas for an abuse of discretion.[2]

_____

2  In this case, the Board's order did not discuss the ALJ's decision to revoke the subpoena.  Since the Board failed to provide any discussion relating to

(continued...)

*See, e.g., Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994).

> In exercising [its] discretion, . . . the Board must comply as far as practicable with the rules of evidence applicable in federal courts. Thus, unless the special characteristics of an administrative hearing require otherwise, the Board may revoke a subpoena only if to do so would be proper in federal district court. Such revocation generally requires a valid evidentiary objection to the material sought under the subpoena.

*Canova v. NLRB*, 708 F.2d 1498, 1501 (10th Cir. 1983) (citations omitted).

Section 11(1) of the Act governs the issuance of subpoenas in NLRB proceedings. This section provides that "[t]he Board, or any member thereof, shall upon application of any party to [its] proceedings, forthwith issue to such party subpoenas requiring the attendance and testimony of witnesses . . . in such proceedings . . . ." 29 U.S.C. § 161(1). On application of the subpoenaed party, "the Board shall revoke[] such subpoena if in its opinion the evidence whose production is required does not relate to . . . any matter in question in such proceedings, or if in its opinion such subpoena does not describe with sufficient particularity the evidence whose production is required." *Id*. "Although the statute explicitly permits the quashing of subpoenas only for irrelevance or lack of particularity, it does not explicitly exclude other grounds." *Drukker*

---

[2](...continued)
the subpoena revocation, we must assume that the Board relied on the same grounds as the ALJ. For this reason, we review for abuse of discretion the Board's implicit affirmance of the ALJ's analysis in revoking the subpoena. *See General Engineering, Inc. v. NLRB*, 341 F.2d 367, 371-72 (9th Cir. 1965).

*Communications, Inc. v. NLRB*, 700 F.2d 727, 730 (D.C. Cir. 1983). Rather, the statute provides that the Board may also revoke a subpoena on any other ground which is consistent with the overall powers and duties of the Board under the Act considered as whole. "In short, section (11)(1) is not intended as a complete and inclusive catalogue of all grounds upon which a Board subpoena may be revoked." *General Engineering, Inc. v. NLRB*, 341 F.2d 367, 373 (9th Cir. 1965).

In this case, Interstate requested several categories of Union documents and records, including the following:

1.    The current constitution of the International Union ("IU")

2.    The current by-laws of [the Union]

3.    All current collective bargaining agreements to which [the Union] is a party;

4.    The following records generated between January 1, 1998 and the present relating to Jerry Griffith, John Buntin, Wesley Stillsmoking, Floyd Woods, and/or Derrick Haggard:
      a.    Records of the payment of dues and other financial contributions to the [IU or Union].
      b.    Records of the payment of pension and other retirement benefits made by the [IU or Union].
      c.    Records of referrals for work to any employer through any hiring hall or other referral system operated by [the Union].
      d.    Records of work performed for any employer.
      e.    All letters, memoranda, notes and reports relating to the activities or status of such persons as members of the [IU or Union].

4.    [sic] All minutes of meetings of the membership of [the Union] from January 1, 1998, to present.

-15-

5. All minutes of meetings of any committee of [the Union] from January 1, 1998, to the present.

6. All resolutions passed by [the Union] from January 1, 1998 to the present.

7. All manuals or other instructional material relating to means and methods to organize employees for the purpose of collective bargaining including so-called "salting" initiatives.

8. All newsletters and other publications of general distribution to the membership of the [IU and Union] from January 1, 1997, to the present.

9. Documents and other material generated by, or for, John Norman relating to his schedule of work and duties as an employee of [the Union], including, but not limited to, calendars, time slips, appointment books for the period of March 23, 1998, to April 3, 1998.

10. All written reports or notes of any oral reports submitted by John Norman between January 1, 1998, to the present in his capacity as an employee of [the Union].

11. All letters written or received by [the Union], notes, memoranda or other material referring to or relating to Interstate Building, Inc.

Before the ALJ, Interstate argued that it needed these documents to support its affirmative defense to the Union's allegations. Specifically, Interstate sought to demonstrate that the Union representatives aspired to "strip" Interstate's employees and thereby damage Interstate's business. The Union objected to production of these documents on relevancy and confidentiality grounds.

The ALJ revoked all the document requests except for numbers 9 and 10,

finding the requests "too speculative in nature and that it was a fishing expedition type of subpoena" or "at best, an attempt at pretrial discovery, which is not allowed by the Board." The ALJ alternatively justified the revocation by stating that the requested materials were "not relevant or material to any issue bearing on [Interstate's] conduct in this case dealing with its interaction with the job applicants," but appeared instead to be a "collateral attack" on the Union's salting program. Based on these findings, the ALJ concluded that "the likelihood of it producing any information that would tend to relate to any material fact in dispute is so remote that it is an unjustified burden on the parties and the procedures of the Board."

Initially, we reject the ALJ's conclusion that the requested documents were irrelevant. The ALJ's own discussion of the documents belies this conclusion. The ALJ found that "[Interstate's] request would appear to be a collateral attack on the Union's organizing practice or 'salting' program." Although we are uncertain what the ALJ meant by "collateral attack," the ALJ correctly concluded that Interstate sought the documents in order to determine the nature of Union's salting initiative, namely, whether Interstate was engaging in activity unprotected under the NLRA. The ALJ also allowed Interstate to question the General Counsel's witnesses concerning the requested documents, further undermining his relevancy conclusion. We agree with Interstate that "if questions about a

-17-

particular subject are relevant to the issues then documents relating to that same subject matter must likewise be relevant." Finally, we also agree with Interstate that the ALJ's alternative justification – that the document requests were overly burdensome and constituted a "fishing expedition" – is in tension with his relevance conclusion. The protection afforded by Federal Rule of Civil Procedure 26(b)(2), which prohibits overly burdensome discovery, presupposes that the materials are relevant.

Our determination that the ALJ's stated grounds for revoking the subpoena were inconsistent does not, however, conclude our analysis. If the ALJ based his decision on two reasons, one correct (insufficient particularity) and one incorrect (irrelevance), we would hesitate to find an abuse of discretion. Thus, while it is true that some of the evidence sought may well have been relevant to Interstate's affirmative defense, we must also consider whether the ALJ was correct in concluding that the subpoena, taken as a whole, constituted a "fishing expedition." *See Drukker Communications*, 700 F.2d at 732 (stating that "more generalized 'fishing expeditions' for helpful evidence . . . have uniformly been rejected"); *J.H. Rutter Rex Mfg. Co., Inc. v. NLRB*, 473 F.2d 223, 231 (5th Cir. 1973) (fact that Board's files may have contained relevant evidence did not "entitle company to a wholesale fishing expedition into the Board's files"); *but cf. EEOC v. Dillon Companies, Inc.*, 310 F.3d 1271, 1275 (10th Cir. 2002) (finding

in context of EEOC charge that "even some requests we previously considered to be administrative 'fishing expeditions' are often permitted") (internal quotation marks omitted); *NLRB v. Bakersfield Californian*, 128 F.3d 1339, 1340 (9th Cir. 1997) (reversing district court's holding that section 11(1) does not authorize the Board to engage in fishing expeditions at the expense of the newspaper's legitimate business interest); *EEOC v. University of New Mexico*, 504 F.2d 1296, 1303 (10th Cir. 1974) (noting that some subpoenas "which we have previously considered to be administrative 'fishing expeditions' are often permitted").

Our review of the subpoena suggests that some of Interstate's requests were indeed overly broad; clearly, Interstate did not tailor its discovery request as closely as it could have. We are not, however, convinced that the requests were so overbroad so as to constitute a wholesale "fishing expedition" meriting revocation in almost every particular. We therefore find that the ALJ abused his discretion in summarily revoking the bulk of the subpoena.

B.    *Prejudice*

Demonstrating that the ALJ abused his discretion in revoking the subpoena does not, however, entitle Interstate to relief. Interstate must also demonstrate that the ALJ's abuse of discretion placed a prejudicial "barrier in the way of [its] ability to present its case." *Joseph T. Ryerson & Son, Inc. v. NLRB*, 216 F.3d 1146, 1154 (D.C. Cir. 2000); *see NLRB v. Cent. Okla. Milk Producers Ass'n*, 285

F.2d 495, 498 (10th Cir. 1960 ("There can be no cause for reversal [based on revocation of a subpoena] in the absence of some proof of resulting prejudice."). We conclude that Interstate failed to make a sufficient showing of prejudice with respect to the termination of Norman and the refusal to hire the May 12 applicants.

1. Prejudice with respect to the Norman termination claim

Regarding Norman's termination, Interstate received the requests numbered 9 and 10. These documents included all materials generated by, or for, John Norman relating to his schedule of work and duties as an employee of the Union, including, but not limited to, calenders, time slips, appointment books for the period of March 23, 1998, to April 3, 1998, and all written reports or notes of any oral reports submitted by John Norman between January 1, 1998, to the time of the hearing generated in Norman's capacity as an employee of the Union. Interstate concedes that documents contained in numbers 9 and 10 are not in issue. Included in these documents was Norman's written report, in which he recited his March 30, 1998, conversation with Harry Young. In this report, Norman stated that he told Young "that Hopper would not be back, that I signed him to the Union, I told him that was my job."

Furthermore, at the hearing, Norman testified that he induced Hopper to leave Interstate, and Norman's testimony was confirmed by the testimony of

Hopper.  As such, we cannot see how the ALJ's revocation prejudiced Interstate's ability to assert an affirmative defense concerning Norman's allegedly unprotected activity.  For this reason, we find that Interstate was not prejudiced by the ALJ's revocation of the subpoena as it related to the Norman termination violation.

2.  Prejudice with respect to the refusal-to-hire claim

We conclude, for several reasons, that Interstate failed to demonstrate prejudice with respect to the ALJ's conclusion that Interstate's refusal to hire the May 12 applicants violated the NLRA.

As an initial matter, we agree with Interstate that, in circumstances not well-defined by the caselaw, employee[3] misconduct might rise to the level of a "disabling conflict," which in turn can justify a company's termination of, or refusal to hire, union employees.  *See, e.g., Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1060 (D.C. Cir. 2003); *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190 (D.C. Cir. 2003).  Thus, Interstate could have taken the position that the May 12 applicants intended to engage in a sabotage campaign in order to run Interstate out of business, and that this disabling conflict constituted its motivation for refusing to hire them.  But prevailing on this theory would have

_____

[3] At oral argument, Interstate conceded that it was not advancing the separate legal argument that the May 12 applicants were not "employees" within the meaning of the NLRA.

required Interstate to show that it would have refused to hire the May 12 applicants *for this reason alone*, i.e., even in the absence of anti-union animus. *Ready Mixed Concrete*, 81 F.3d at 1550 (emphasis added).

Interstate fails by a wide margin to provide the necessary support for this argument. Before the ALJ, and before this court on appeal, Interstate relied on its policy of dealing directly with job applications to justify its refusal to hire the May 12 applicants. According to Interstate's own brief, "[i]t is apparent from the overall record that [Interstate's] *only* reason for refusing to hire the four individuals was their insistence on dealing with [Interstate] through a collective bargaining representative." (emphasis added). We cannot reconcile this statement with Interstate's prejudice argument on appeal, which appears to be as follows: (1) Interstate's "other" or "true" motivation for its refusal to hire the applicants was the sabotage campaign in which Interstate argues the May 12 applicants intended to engage; (2) the ALJ, by revoking the bulk of the subpoena, deprived Interstate of documents that might have demonstrated the existence of such a disabling conflict; (3) Interstate was thereby prevented from advancing its "other" or "true" motivation because of the resulting absence of documentary support; and (4) this obstacle to the presentation of its affirmative defense constitutes prejudice requiring us to deny enforcement of the Board's order.

We reject this argument for two reasons. First, denying Interstate access to

the documents at issue did not prevent the company from explaining its "true" motivation for refusing to hire the May 12 applicants. Presumably, it was and remains the ultimate authority on its own motivation and could have articulated it absent "documentary support" from the Union's files. The revocation at most temporarily deprived Interstate of documents that might have provided evidence supporting the *reasonableness* of that "other" or "true" motivation; and, as we note below, even this possible deprivation was mitigated by the ALJ's "curative" statement that he would entertain additional document requests should the relevance of the documents become apparent during examination.[4] Second, the tension between the two positions Interstate advances makes it highly unlikely that the ALJ would have concluded that either justification rebutted the General Counsel's prima facie showing of anti-union animus.[5] *Cf. Dillon Stores*, 643 F.2d 687, 693 (10th Cir. 1981) (finding that the employer's proffer of "a flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an antiunion motivation").

Moreover, the record is replete with evidence supporting the ALJ's

---

[4] We acknowledge – and have already discussed as grounds for our finding of an abuse of discretion – the ALJ's internally inconsistent and legally erroneous relevance discussion. The ALJ's error did not, however, in our judgment deprive Interstate of the ability to articulate its own motivation for the challenged conduct.

[5] See our discussion in Part IV, *infra*.

conclusion that Interstate refused to hire the May 12 applicants based on simple

anti-union animus, rather than concern about a sabotage campaign.[6]  Indeed,

Interstate points to *no* evidence in the record that would support a finding that its

motivation for the refusal to hire was its belief that the May 12 applicants

intended to engage in a sabotage campaign.  Thus, even if the requested

documents could have substantiated the reasonableness of Interstate's ostensible

motivation, Interstate would have to first point to evidence that this *was*, in fact,

its motivation.  Insofar as Interstate has failed to do anything of the kind, we

cannot conclude that the ALJ's error prejudiced Interstate.  *Ready Mixed*

*Concrete*, 81 F.3d at 1553 ("[O]ur review is limited to ascertaining whether

substantial evidence supported the Board's conclusion that [the company] did not

carry its burden.  It is not for [the company] to prove that it '*could have*

discharged [the employee for his actions], but whether it *would have done so*

*regardless of [his] union activities*." ) (emphasis added).

Finally, the ALJ allowed Interstate to question Union members about the

---

[6] See our discussion in Part IV, *infra*, discussing the General Counsel's prima facie case of a discriminatory refusal to hire and Interstate's proffered rebuttal.  Although a disabling conflict can rebut the General Counsel's prima facie case, we again note that Interstate failed to articulate this alternative explanation of its motivation below, and that the ALJ's revocation of Interstate's document requests would have, at most, compromised Interstate's ability to demonstrate the reasonableness its (unarticulated) motivation, not its ability to explain why it took the challenged action.

existence of the requested documents and the information, if any, that the documents contained. Further, the ALJ specifically informed Interstate that it could renew its request at a later point:

> If some things come up during the examination of the witness that would tend to indicate the presence of documents that are relevant to some issue that will be decided here, then I will entertain any subsequent motion by [Interstate] for the production of those documents.

NLRB Order, at 7. Despite this offer, Interstate made no further requests for the production of documents. Instead, it emphasized that its sole motivation in refusing to hire the May 12 applicants was its firm policy of dealing directly with job applicants as opposed to their representatives.

### 3. Conclusion

For the foregoing reasons, we conclude that Interstate failed to demonstrate prejudice resulting from the ALJ's revocation of its subpoena.

### III. Whether Substantial Evidence Supported the NLRB's Conclusion that Interstate's Termination of John Norman Violated the NLRA.

We next consider the NLRB's conclusion that Interstate violated section 8(a)(3) and (1) of the NLRA by terminating John Norman's employment. In its July 31, 2001, order, the NLRB adopted the ALJ's ruling, wherein the ALJ concluded that "Norman was fired because [Interstate] would not put up with Norman's *organizing efforts* . . . [and Interstate] has failed to persuasively show

that Norman would have been terminated even in the absence of his union activities." NLRB Order, at 10 (emphasis added).

On appeal, Interstate raises two principal challenges to the NLRB's conclusion. First, Interstate contends that it discharged Norman because he requested a wage increase, conduct which Interstate contends is not protected under the NLRA. Second, Interstate argues that it discharged Norman for inducing Richard Hopper to leave Interstate's employment, conduct which Interstate again contends is not protected under the NLRA. We consider each contention in turn.

With respect to the former, the ALJ rejected Interstate's contention that Norman's request for a pay raise constituted its "true" motivation for its discharge. For the reasons set forth below, we conclude that substantial evidence supports this finding.

First, although Harry Young fired Norman immediately after Norman requested a pay raise, Young's comments to Norman did not focus on the pay-raise request; rather, as the ALJ noted, "Young clearly express[ed] his irritation with Norman by commenting that Norman would just organize any new [worker] (and induce him to leave as Hopper did)." *Id.* at 9-10. In other words, Norman's "organizing efforts," rather than his request for a pay raise, appear to have been Young's primary concern.

Second, as the ALJ noted, Interstate had initially refused to hire Norman on February 23, 2001, based on his position as a "union organizer."[7] In addition, Interstate contemporaneously engaged in numerous other unfair labor practices, including its unlawful interrogation of employees and its imposition of more onerous working conditions on those affiliated with the Union. The ALJ properly considered Interstate's contemporaneous unfair labor practices, *MJ Metal Prods.*, 267 F.3d at 1065, and we agree that these acts support a finding of anti-union animus on the part on Interstate.

Third, before the ALJ, Interstate advanced pretextual explanations for Norman's departure, arguing that Norman quit and suggesting that Interstate fired Norman based on his poor work-attendance record. NLRB Order, at 9. As we have previously noted, the NLRB may properly consider the "credibility of [the company's] explanation of the reasons for the discharge," *MJ Metal Prods.*, 267 F.3d at 1065, and "a flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation," *NLRB v. Dillon Stores, a Division of Dillon Cos., Inc.*, 643 F.2d 687, 693 (10th Cir. 1981).

---

[7] Based on the briefs submitted by Interstate to this court, it does not appear that Interstate challenges on appeal the Board's finding that Interstate violated the Act by initially refusing to hire John Norman on February 23, 1998. We simply note that substantial evidence clearly supports the finding. Accordingly, the NLRB is entitled to enforcement of this aspect of its July 31, 2001, order.

We next consider Interstate's alternative justification for its termination of Norman: the fact that Norman induced Richard Hopper to join the union and leave Interstate's employment.[8]  For purposes of argument only, we assume, as Interstate contends, that the ALJ concluded that Interstate terminated Norman based in part on the fact that he induced Richard Hopper to leave Interstate's employment.[9]  We further assume, as Interstate suggests, that Norman's conduct in inducing Hopper to leave Interstate's employment was separable from his other, protected "organizing efforts," and that Interstate therefore *could have* terminated Norman on this basis without violating the NLRA.

But even making these two assumptions, we must still conclude that

---

[8] Initially, we note that Interstate did not raise this theory before the ALJ and arguably failed to do so with sufficient clarity in its exceptions before the NLRB.  Ordinarily, an "objection that has not been urged before the Board, its member, agent, or agency, shall [not] be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  29 U.S.C. § 160(e).  Further, a party must raise its objection "with sufficient specificity and clarity [so] that the tribunal is aware that it must decide the issue, and in sufficient time that the agency can do so."  *Kachanis v. Dep't of Treasury*, 212 F.3d 1289, 1293 (Fed. Cir. 2000).  As we do with the rest of the elements of Interstate's alternative justification theory, we assume – for purposes of argument – that Interstate raised the argument with the requisite particularity before the Board.

[9] Interstate erroneously contends that the ALJ found this to be Interstate's sole motivation for discharging Norman.  To the contrary, the NLRB unambiguously concluded that "Norman was fired because [Interstate] would not put up with Norman's *organizing efforts* . . . [and Interstate] has failed to persuasively show that Norman would have been terminated even in the absence of his *union activities*."  NLRB Order, at 10 (emphasis added).

-28-

substantial evidence supported the ALJ's finding of a violation. As we noted in *Ready Mixed Concrete*, "[i]t is not [sufficient] for [Interstate] to prove that it could have discharged [Norman for his actions], but whether it *would* have done so *regardless of [his] union activities*." 81 F.3d at 1553 (quoting *Presbyterian/St. Luke's Med. Center v. NLRB*, 723 F.2d 1468, 1480 (10th Cir. 1983)) (internal quotation marks omitted) (second emphasis added). Thus, even assuming that Norman's inducing Hopper to leave precipitated Interstate's termination of Norman in part – making this a "mixed motive,"[10] or even a "disabling conflict"[11] case – we agree with the ALJ that Interstate "failed to persuasively show that Norman would have been terminated even in the absence of his union activities." NLRB Order, at 10.

In sum, "substantial evidence supports the Board's determination that the General Counsel for the Board proved a prima facie case of unlawful discriminatory discharge, and that [Interstate] did not meet its burden of showing that [Norman] would have been discharged in the absence of his protected union activity." *Miera v. NLRB*, 982 F.2d 441, 446 (10th Cir. 1992). Accordingly, the NLRB is entitled to enforcement of this portion of its July 31, 2001, order.

---

[10] *See, e.g.*, *Miera v. NLRB*, 982 F.2d 441, 446 (10th Cir. 1992).

[11] *See, e.g., Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1060 (D.C. Cir. 2003); *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190 (D.C. Cir. 2003).

IV.     Whether Substantial Evidence Supported the NLRB's Conclusion that

         Interstate's Refusal to Hire the May 12 Applicants Violated the NLRA.

        Substantial evidence clearly supports the Board's conclusion that Interstate

violated the Act when it refused to hire the four May 12 applicants.  The elements

of a refusal-to-hire violation are as follows:

> To establish a discriminatory refusal to hire, the General Counsel
> must, under the allocation of burdens set forth in *Wright Line*, 251
> NLRB 1083 (1980), *enfd*. 662 F.2d 899 (1st Cir. 1981), *cert. denied*
> 455 U.S. 989 (1982), first show the following at the hearing on the
> merits:  (1) that the respondent was hiring, or had concrete plans to
> hire, at the time of the alleged unlawful conduct; (2) that the
> applicants had experience or training relevant to the announced or
> generally known requirements of the positions for hire, or in the
> alternative, that the employer has not adhered uniformly to such
> requirements, or that the requirements were themselves pretextual or
> were applied as a pretext for discrimination; and (3) that antiunion
> animus contributed to the decision not to hire the applicants.  Once
> this is established, the burden will shift to the respondent to show
> that it would not have hired the applicants even in the absence of
> their union activity or affiliation.

*FES (a Division of Thermo Power) v. NLRB*, 2000 WL 627640, at *6 (footnotes

omitted).  The Board agreed with the ALJ that (1) the General Counsel carried its

burden of proof as to the elements of the requisite prima facie case, and (2)

Interstate failed to establish that it would not have hired the applicants absent

their affiliation with the Union.

        The Board cited ample evidence supporting its conclusion that the General

Counsel had carried its burden as to each element of its prima facie case.  As to

-30-

the first element, the Board noted the following: (1) Interstate had advertised its need for ironworkers; (2) Interstate stipulated that it hired 59 ironworkers between February 23 and September 15; and (3) Interstate continued to hire employees after refusing to hire the May 12 applicants. As to the second element, the Board noted that (1) the record establishes that the four applicants were experienced journeyman ironworkers, and (2) Interstate did not contend that the applicants were not qualified. And as to the third element, the Board noted Young's hostile reaction to the applicants' attempts to submit their applications. It found especially pertinent Young's questioning of the applicants as to their union status and his statement that they should "file another goddamn complaint."

Once the General Counsel has established a prima facie case, the burden shifts to the company to demonstrate that it would not have hired the applicants absent their union affiliation or activities. *Id.*; *Wright Line*, 251 NLRB 1083 (1980), *enfd.* 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982). Substantial evidence clearly supports the Board's conclusion that Interstate failed to carry this burden.

According to Interstate, "[t]he basis for the Company's refusal to consider the employment applications submitted by five (5) [sic] individuals on May 10 [sic] was that they sought to be represented by Union official John Hunter [sic] during the application process." Respondent Br. at 25. While it is true that

Napier sent the Union a letter articulating its firm policy of dealing directly with job applicants rather than with representatives, the existence of such a policy does not render the Board's conclusion – that the proffered explanation was pretextual – incapable of satisfying a reasonable factfinder. *See MJ Metal Products*, 267 F.3d at 1065. Quite the contrary.

As the ALJ pointed out, evidence of Interstate's anti-union animus was plentiful.[12] We note that it included several violations of the NLRA that Interstate does not challenge before this court, but which the ALJ and the Board properly considered as circumstantial evidence of the employment decision at issue. *Id.* ("The NLRB may consider factors such as the employer's knowledge of the employee's union activities, *the employer's commission of other unfair labor practices*, the timing of the employer's action, and the credibility of its explanation of the reasons for the discharge.") (emphasis added). Furthermore, as we have already discussed, the contemporaneous circumstances of Interstate's refusal to accept the written applications strongly supports an inference that the refusal was motivated by anti-union animus: Young interrogated the applicants about their union status, and in refusing to accept their written applications told them to "file another goddamn complaint." Moreover, in response to Buntin's

_____

[12] The Board incorporated the ALJ's comments by reference. NLRB Order, at 2.

direct question about the newspaper advertisement inviting applications, Interstate provided the applicants with a false explanation for its refusal to accept the written applications, i.e., that it was not hiring. *See NLRB v. Dillon Stores*, 643 F.2d 687, 693 (10th Cir. 1987) (proffer of false reason supports inference that true reason is anti-union animus).

Under the applicable standard of review, the Board's conclusion need only constitute a "plausible inference" from the evidence. *MJ Metal Products*, 267 F.3d at 1065. Interstate's stated policy of dealing directly with applicants fails, by a wide margin, to render implausible the Board's conclusion that anti-union animus motivated its refusal to consider the May 12 applicants. Accordingly, the NLRB is entitled to enforcement of this aspect of its July 31, 2001, order.

## CONCLUSION

Based on the foregoing, we GRANT enforcement of the Board's July 31, 2001 order.

02-9507, *National Labor Relations Board v. Interstate Builders*
**McConnell**, **J.**, concurring in part and dissenting in part

In labor parlance, a "salt" is a volunteer or professional organizer for a labor union who takes a job with an employer for the purpose of helping the union organize the workplace. In *NLRB v. Town & Country Electric, Inc.*, 516 U.S. 85 (1995), the Supreme Court held that a "salt" falls within the statutory definition of an "employee" under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and thus is protected against discharge for engaging in protected union organizing activity. The Court emphasized, however, that employers have ample means for protecting themselves from the abuses that can arise from "salting" campaigns. The Court took note of what it called "the practical considerations" raised by the employer in that case, namely that "'salts' might try to harm the company, perhaps quitting when the company needs them, perhaps disparaging the company to others, perhaps even sabotaging the firm or its products." *Id.* at 96. The court explained that "the law offers alternative remedies for [the company's] concerns." *Id.* One of these is: "A company faced with unlawful (or possibly unlawful) activity can discipline or dismiss the worker." *Id.* at 97; *see also NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17 (1962) (allowing discharge for union-related acts that "show a disloyalty to the workers' employer"). In my view, the case before us tests whether that remedy is truly available.

When an employer is charged with an unfair labor practice on account of

discharging an employee, it is essential to distinguish between that worker's protected and unprotected labor organizing activity. *Timpte, Inc. v. NLRB*, 590 F.2d 871 (10th Cir. 1979); *see Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996) (the General Counsel "must establish that the employee's *protected conduct* was a substantial or motivating factor in the discharge decision") (emphasis added). The Supreme Court made clear in *Town & Country* that a worker has no protected right to engage in acts designed to harm the company, even if these might have the indirect effect of pressuring the company to unionize. 516 U.S. at 96-97; *see also Technicolor Gov't Servs., Inc.*, 276 N.L.R.B. 383, 387 (1985) (employees' activity "designed to injure their employer's business have been found to be without the protection of the Act"). An employer is entitled to discharge a worker for disloyalty, even if his acts of disloyalty are part of a union organizing campaign. As the Supreme Court stated in *NLRB v. Local Union No. 1229, IBEW*, 346 U.S. 464, 472 (1953):

> There is no more elemental cause for discharge of an employee than disloyalty to his employer. It is equally elemental that the Taft-Hartley Act seeks to strengthen, rather than to weaken, that cooperation, continuity of service and cordial contractual relation between employer and employee that is born of loyalty to their common enterprise.

To hold the company liable when it discharges a worker for unprotected acts of disloyalty would upset the careful balance struck by Congress and described by the Court in *Town & Country*.

Disturbingly, in this case the administrative law judge (ALJ), affirmed by the Board, made no attempt to distinguish between legitimate labor organizing activity, which is protected by the Act, and the possibly unprotected acts of union "salts" that the employer contends were designed to harm the Company and thus to increase the pressure to give in to a unionization campaign. The ALJ lumped all of the activity together under the single rubric of "organizing activity," without explaining why the relevant acts were protected. The decision below thus deprived the Company of the "alternative remedies" guaranteed under the labor laws. *Town & Country*, 516 U.S. at 96-97.

I

The first issue in this case involves the discharge by Interstate Builders of John Norman, a full-time employee of the Ironworkers Union assigned to organize at the Company. The Company claims he was discharged for engaging in unprotected activity, namely persuading a fellow employee to join the Union, quit the company, and go work for a competitor.[1] The ALJ, affirmed by a three-member decision of the Board, found that the discharge was motivated by anti-

---

[1]The Company also asserted a second justification for the discharge: that Norman demanded a $6 per hour pay raise. Respondent's Br. 24. The majority affirms the finding below that this was a pretext. Op. 26-27. Because I believe there was substantial evidence to support the ALJ's conclusion that "it is clear that Norman was fired because [the Interstate official who fired Norman] would not put up with Norman's organizing efforts," NLRB Order 10, I will not further discuss this alternative ground.

union animus.

Uncontradicted evidence in the record shows that in February, 1998, Interstate Builders President Bill Napier, a former Union member, offered to sign an agreement to unionize, provided it would take effect three months thence. The Union refused this offer. The Union then initiated a campaign that the Company claims was designed to force it out of business. The Union instructed the eight or ten unionized iron workers at Interstate Builders to leave Interstate and to move to jobs with its competitors. They did so, leaving the Company short of workers to fulfill its contracts. Norman then applied for a job with Interstate. On his application form, despite almost twenty years of experience in ironwork, the sole "employment history" he mentioned was "Ironworker Local 48." He also listed as "salary expected" an amount $6 per hour higher than the wage the Company paid for that position, $16 per hour. Tommy Young, an Interstate supervisor, testified, and Norman did not deny, that Norman told him "if he could not organize us, he was going to take our employees."

Although not hired on his first application,[2] Norman was hired a month later, for $16 per hour. He was assigned to work on a two-man job with Richard Hopper. Hopper testified that during their two-and-one-half days working

---

[2]The ALJ found and the Board affirmed that the Company's refusal to hire Norman on this occasion was an unfair labor practice. Interstate does not challenge that finding on appeal.

together, Norman "hound[ed]" him up to four times a day, telling him to stop working for Interstate because the Union needed him. Hopper also testified that Norman said that, "[I]f they can't be a union company then we'll want to get them out of business. We've got to get something on them." The following Monday, Norman informed the Interstate foreman, Harry Young, that he had "signed [Hopper] to the Union" and that Hopper would not be returning to Interstate. Norman then complained that he could not do the work assigned alone and asked for another helper. Young asked why he should hire another worker, when Norman would just organize him and the Union would assign him to work for another company. Norman said that was his job as a Union organizer. Norman then demanded a pay increase. Young fired him. The question before us is whether Norman's discharge was an unfair labor practice.

The ALJ specifically found that Norman was fired for persuading Hopper to join the Union and leave the Company:

> Harry Young clearly express[ed] his irritation with Norman by commenting that Norman would just organize any new helper (and induce him to leave as Hopper did), said he wouldn't put up with "this shit," and he then terminated him by telling Norman to get his check. Under these circumstances it is clear that Norman was fired because Young would not put up with Norman's organizing efforts.

NLRB Order 9-10 (paragraph break omitted); *see also id.* at 9 (finding that the Company "became annoyed with [Norman] after lea[rn]ing that his coworker had left for a union job"). It is important to note that the ALJ makes no mention of

-5-

any organizing activity by Norman other than these conversations with Hopper. Indeed, the record contains no evidence of any other organizing activity in which Norman was engaged during his brief stint with the Company. Neither the ALJ nor the Board suggested that Norman was discharged for labor organizing activity prior to his employment with Interstate. In any event, since the Company hired him in full awareness of his organizing activity, that would not be a plausible explanation of the facts.

Proper resolution of this case, then, hinges on the following legal question: Was Norman's conduct in persuading Hopper to join the Union and quit the Company protected activity under the Act? The answer is unquestionably "no." The Board has squarely held that inducing employees to quit is not protected labor organizing activity under the Act. *Clinton Corn Processing Co.*, 194 N.L.R.B. 184, 185-86 (1971) (company's actions were not unfair labor practices because they were motivated only by complainant's "unprotected conduct in inducing [the company's] employees to quit"); *see also Technicolor Gov't Servs.*, 276 N.L.R.B. at 389 (stating that a "solicitation to quit" by a union steward to fellow employees "would remove the Act's protection"); *Boeing Airplane Co. v. NLRB*, 238 F.2d 188, 193-95 (9th Cir. 1956) (employee's service as agent seeking to place employer's engineers with competitors was unprotected activity and valid ground for discharge). To convince other workers to quit and to work for

competitors is an act of disloyalty, injurious to the employer, and is a legitimate basis for discharge.

In its brief in this Court, the Board does not argue that persuading other employees to quit is protected conduct under the Act.  Instead, the Board disputes the Company's factual contention that this was the reason for Norman's termination.  *See* Petitioner's Br. 19 ("The Company failed to demonstrate that those reasons [the second of which was "Norman had induced another employee to quit the Company and work for a union contractor"] motivated it to fire Norman . . . ."); *id.* at 21 ("The Company's newly minted assertion that it fired Norman because he 'induced' employee Hopper to quit is unsupported by any testimony from company decisionmakers that they discharged Norman for that reason.") (citation omitted).  However, the ALJ expressly found that this was the Company's reason for firing Norman, and the Board affirmed.[3]  The Board may

_____

[3]The Board's argument in its brief, "that Harry Young's complaint to Norman—that 'you'll just organize' any new workers that would be assigned to Norman—was, by its own terms, directed at Norman's organizing activity and not at his inducing Hopper to leave," Petitioner's Br. 21, is inconsistent with the ALJ's finding that the Company "became annoyed with [Norman] after lea[rn]ing that his coworker had left for a union job."  NLRB Order 9.  The Board's three-word quotation of Young ("you'll just organize") strips those words of their context.  After persuading Hopper to quit – just as all other members of the Union had quit – Norman asked Young to hire another worker to work with him.  When Young asked "why, because Norman would just organize them," *id*., it is apparent from the context that Young understood that Norman's intention was to persuade workers who joined the Union to quit, making it pointless to hire new co-workers

(continued...)

not make arguments on appeal, nor could this Court affirm, on a legal basis that differs from the findings below. *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 714 n.1 (2001); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 289-90 (1974); *see generally SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *INS v. Mickeviciute*, 327 F.3d 1159, 1162-63 (10th Cir. 2003); *St. Anthony Hosp. v. United States Dep't of Health and Human Servs.*, 309 F.3d 680, 699 (10th Cir. 2002).[4] Because the ALJ's decision, affirmed by the Board, rested on an erroneous proposition of law, it must be reversed.

_____

[3](...continued)
for him. To the extent the Board now argues otherwise, the argument is precluded by the ALJ's finding, affirmed by the Board, that "Harry Young clearly expresse[ed] his irritation with Norman by commenting that Norman would just organize any new helper (*and induce him to leave as Hopper did*)," NLRB Order 9-10 (emphasis added).

[4]The Board also argues that we may not consider Interstate's argument that it fired Norman because he induced Hopper to quit because Interstate failed to preserve that argument in proceedings before the Board. Generally, an "objection that has not been urged before the Board, its member, agent, or agency, shall [not] be considered by the court." 29 U.S.C. § 160(e). However, Interstate was not required to object to the ALJ's finding that it fired Norman because of his activities with respect to Hopper, because Interstate now agrees with that finding. The relevant inquiry is whether Interstate objected to the ALJ's legal conclusion that Norman's activities were protected under the Act. It clearly did so. In its brief to the Board in support of exceptions to the ALJ opinion, Interstate pointed to Norman's statements regarding the Union's campaign to drive Interstate out of business by stripping its employees and specifically argued that inducing employees to quit is unprotected conduct. Respondent's Br. in Support of Exceptions to the Decision of the ALJ, 25-26. This objection was sufficiently specific to allow the Board to consider and rule on the issue, which the Board did by affirming the ALJ. *See May Dept. Stores Co. v. NLRB*, 326 U.S. 376, 386 n.5 (1945).

The majority states that "even assuming that Norman's inducing Hopper to leave precipitated Interstate's termination of Norman in part . . . we agree with the ALJ that Interstate 'failed to persuasively show that Norman would have been terminated even in the absence of his union activities.'" Op. 28-29 (quoting NLRB Order 10). With all respect, this misses the argument. The question is not whether Norman was discharged for engaging in "union activities"; the question is whether the particular "union activities" in which Norman engaged were protected conduct under the Act. It is established – and neither the Board nor the majority disputes – that inducing other employees to quit is unprotected conduct. *Clinton Corn Processing*, 194 N.L.R.B. at 186-87. The ALJ found – and neither the Board nor the majority disputes – that Norman persuaded Hopper to quit and that this incident was the reason for Norman's termination. The ALJ's opinion provides no basis for a holding that Norman would have been terminated in the absence of his activities toward Hopper. Because the only "union activities" identified by the ALJ were unprotected, it follows that there is no legal basis for affirming the enforcement order.

II

Whether the Board properly concluded that Interstate violated the Act when it refused to hire the four May 12 applicants is a closer question. I agree with the majority that the General Counsel established a prima facie case. But at the next

-9-

stage of the analysis, Interstate makes a powerful claim that its refusal to hire was based on a firm rule against hiring workers through the Union. Because hiring through a union is incident to collective bargaining, an employer is not required under the labor laws to do so unless the union has been certified as the bargaining agent by majority vote of the workers in the relevant unit. *NLRB v. Local Union No. 103*, 434 U.S. 335, 344 (1978). Section 8(f) of the NLRA permits, but does not require, employers in the construction industry to enter into "pre-hire" agreements with a union that has not attained majority status. 29 U.S.C. § 158(f). Interstate has entered into no such agreement in this case, and accordingly is not required to accept applications through the Union.

The principal dispute revolves around whether the four workers applied independently. In April, 1998, the Union mailed applications of the four workers directly to the Company. The Union was informed in writing that the Company did not accept the Union as representative of the applicants. The letter suggested that the applicants apply individually. On May 12, the applicants came to Interstate's offices accompanied by Union agent Norman, who was not a job applicant. Only one of the applicants, John "Gib" Buntin, who was an executive board director for the Union, said anything at this meeting. Instead, Norman

spoke for them.[5] Norman informed Tommy Young, the Company supervisor, that "he had four guys who wanted to fill out applications for employment." Young asked whether the applicants were from the Union and on learning that they were, whether they had received the letter of April 9, informing the Union that the Company would not hire through Union representatives. Norman acknowledged receiving the letter, and replied that they were not "union representation." Young answered that the Company "did not need any help" and that he would not accept the applications. As the men left Young's office, Norman attempted to hand Young the applications. Young rejected them and said, "go file another goddamn complaint."

To establish a prima facie case that an employer's refusal to hire an applicant is an unfair labor practice, the General Counsel must show, among other things, that the employer's anti-union animus contributed to the refusal to hire. *FES (a division of Thermo Power)*, 331 N.L.R.B. 9, 12 (2000). If the General Counsel establishes a prima facie case, the burden shifts to the employer to establish that the applicant would not have been hired even in the absence of the discriminatory motive. In this case, the ALJ found and the Board affirmed that there was substantial evidence of anti-union animus, based on other conduct by

---

[5]On cross-examination, Norman was asked whether he spoke for the applicants at the meeting. He responded: "Some of them." R. vol. I, 69.

Interstate roughly contemporaneous with the events in question.  NLRB Order 10.

The ALJ also found and the Board affirmed that Interstate's anti-union animus

"was a motivating factor in its decision to not hire or not accept applications from

the alleged discriminatees."  *Id*.  The ALJ explained:

> Here, Norman and the applicants engaged in a courteous and non disruptive effort to submit application[s] and, otherwise, the Respondent made no effort to ask Norman to leave or ask that it be allowed to see or interview the applicants alone.  Instead, it asked if they were union workers, it adamantly stated it did not want union representation, it rejected any explanation that they were there only to seek the jobs offered in the newspaper, it pretextually told them it didn't need any help (when it was hiring other iron workers), and, with a display of rancor, it rejected an attempt to leave applications for consideration.

*Id*. at 11.  The majority concludes, and I agree, that this constitutes substantial

evidence supporting a prima facie case.[6]

---

[6]Under the NLRB's current jurisprudence, there is some uncertainty whether the General Counsel must also show, as an additional element, that the applicants were genuinely interested in gaining employment and not attempting to provoke the employer into not hiring them so as to provide grounds for an unfair labor practice charge.  In *Exterior Systems Inc*., 338 N.L.R.B. No. 82, 2002 WL 31753333 (November 22, 2002), the Board held that an employer did not commit an unfair labor practice when it refused to hire a Union "salt" who behaved disrespectfully toward company officials when he applied for a job.  Two members of the Board stated in separate concurrences that, under Supreme Court and NLRB precedent, the General Counsel must show that the intent of the "applicant" is to gain employment rather than to provoke a grievance.  *See id*. at *11, *16.  In this case, there is considerable evidence that the May 12 applicants intended such a provocation.  It seems unlikely that genuine job seekers would come to the site with union representation in direct violation of instructions the Company had sent the previous month.  In addition, if their goal was to obtain a job rather than to generate controversy, it was highly imprudent of them to select

(continued...)

But I depart from the majority at the next stage: the analysis of the Company's defense. The Company claims that it had a legitimate nondiscriminatory justification for not hiring the four applicants: namely, its firm policy against hiring workers who apply through Union representatives rather than individually. Neither the Board nor the majority questions that the Company has such a policy or that the policy is lawful. Neither the Board nor the majority questions that the policy applied to the situation on May 12. At the meeting on May 12, Norman, a Union representative, spoke for the applicants (three of whom said nothing during the meeting), and it was Norman – not the applicants – who attempted to hand Young the job applications. None of the individual applicants either spoke to Young to request a job or attempted on their own to submit an application.

The majority concludes that "the proffered explanation was pretextual." Op. 31. Yet the sole evidence cited in support of this conclusion is a recitation of

[6](...continued)
as their spokesman a man whom the Company had fired less than two months previously and who was actively involved in litigation against the Company. Finally, Norman's instructions to Hopper, in which he asked Hopper to help the Union get Interstate on OSHA violations and insisted "we've got to get something on them," suggested that creating grounds for litigation was one of the goals of the Union's "salting" campaign. Nevertheless, because the Company does not press this argument on appeal, and in light of the deference due to the ALJ's conclusion that the four men were "bona fide applicants," I concur with the majority's conclusion regarding the Board's prima facie case.

precisely the same evidence that constituted the prima facie case: evidence that Interstate harbored anti-union animus and that this animus was a contributing factor in the refusal to hire. Op. 32. The Board offered no evidence that the Company's explanation was pretextual and no reason for weighing the evidence as it did. Where, as here, an employer has offered evidence that its challenged actions were based on a legitimate and non-discriminatory policy, the Board may not conclude that those actions were an unfair labor practice without taking the Company's evidence into account. The Board is under no obligation to accept the Company's justification, but it must consider the Company's evidence and explain why it is unworthy of belief. The Board cannot simply look at the evidence on one side of the equation – the evidence of the Company's anti-union bias – and disregard "contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

After the prima facie case is established and the Company has offered evidence of a legitimate reason for its actions, the relevant inquiry is no longer whether the Company harbored anti-union animus, but, as the majority acknowledges, whether it would have refused to hire the applicants even in the absence of anti-union animus. Op. at 21 (citing *Ready Mixed Concrete*, 81 F.3d at 1550). To rebut the Company's defense, there must be some evidence that the Company was inconsistent or insincere in its application of the policy, or perhaps

– in an extreme case – that the Company's anti-union animus was so predominant that any other reason for its actions is purely window-dressing. *See NLRB v. Instrument Corp.*, 714 F.2d 324, 327-28 (4th Cir. 1983) ("it is not enough for the Board simply to declare that the reasons offered by the employer were pretextual; the Board must advert to tangible evidence demonstrating why the good motive was not the sole reason" for the employer's actions.). Neither the Board nor the majority has pointed to any such evidence in this case.

The ALJ focused exclusively on the words exchanged at the meeting on May 12. But nothing said at that meeting has any bearing on whether the Company's policy of not hiring through the Union was pretextual. The ALJ found that Norman had declared that if Interstate "can't be a union company then we'll want to get them out of business." NLRB Order 10. Young became angry at the meeting of May 12, suspecting the applicants of setting the company up for a "goddamn complaint" and sarcastically stating that the Company did not "need any help." The ALJ, seemingly inconsistently, dismissed Norman's threat as mere "braggado," while treating Young's "display of rancor" as evidence of impermissible motivation. NLRB Order 10, 11. It is often difficult to distinguish an employer's anger at a union's tactics from the generic anti-union animus that the labor laws seek to remedy. One of the established tactics of a "salting" campaign is to provoke an employer to refuse to hire an applicant, and then to file

-15-

an unfair labor practices charge with the Board. *See Exterior Systems Inc*., 338 N.L.R.B. No. 82, 2002 WL 31753333, at \*13 (November 22, 2002) (Member Cowen, concurring) (referring to "a rising tide of cases in which union salts have behaved in a hostile, disrespectful, and/or intimidating manner during the application process with a clear purpose of inducing the employer not to hire them so that they could file unfair labor practices with the Board"). But an employer does not forfeit its right not to hire through a union merely because, in the heat of confrontation, company officers grow angry at what union representatives say or do.

Here, the evidence showed that Interstate has a policy of not hiring through a union that has not been chosen by the workers as their bargaining agent. There is no evidence that enforcement of the policy in this instance was pretextual. There was evidence that the union representative, Norman, was trying to drive the Company out of business, and that a Company official became angry at Norman during the meeting and said things he should not have said. I cannot agree with the majority that this is a sufficient basis for holding the Company liable for an unfair labor practice.

### III

Because I conclude that the decision below is not entitled to enforcement on substantive legal grounds, it is not necessary for me to discuss in detail the

procedural issue raised by the Company. I agree with the majority that the ALJ abused his discretion in revoking substantial portions of the Company's subpoena. I point out only that the ALJ's explanation for this decision was of a piece with his treatment of the Company's defenses both as to Norman and as to the four job applicants. The ALJ found that the subpoena was "not relevant" because the Company's "request would appear to be a collateral attack on the Union's organizing practices or 'salting' program." NLRB Order 8. Like the majority (Op. 17), I am uncertain what the ALJ meant by a "collateral attack," but the gist is clear. The ALJ did not consider the Company's defense – that its discharge of Norman and refusal to hire the four applicants were related to its resistance to the abuses of a "salting" campaign – relevant to the unfair labor practices charge. In much the same vein, the ALJ dismissed Norman's explicit statement that if Interstate "can't be a union company then we'll want to get them out of business" as mere "braggado."

The Company believed that the documents it subpoenaed would corroborate its side of the story: that the Union was attempting to drive it out of business by stripping the Company of workers, and that the four applicants were not bona fide applicants for a job, but simply attempting to provoke an unfair labor practices complaint. The ALJ held that the documents were "not relevant" and that the Company's subpoena was a "fishing expedition." As the majority correctly holds,

those explanations do not stand up to scrutiny.  Worse yet, they suggest that the ALJ was simply not receptive to hearing the Company's side of the story.

I therefore join the majority insofar as it grants enforcement of the portions of the order below that are not challenged by the Company, and otherwise respectfully dissent.